WHELCHEL *et al. vs.* THE STATE OF GEORGIA, *ex. rel.* WILEY *et al.*

[This case was argued at the last term, and the decision reserved.]

1. A petition for an information in the nature of a *quo warranto* to call upon the defendants to show by what right they exercised the franchise of using a public bridge as their private property and erecting gates and charging tolls for crossing, alleged that the court of ordinary of the county established a public road running from a church to this bridge, which was built across a river, and on the same day established another public road from the opposite side of the bridge to the county site; that these roads were opened and worked and traveled since as public roads; that the relators, with other citizens, by private subscription built the bridge, and the public used it as a public bridge from March to July, when the respondents put up gates and exacted tolls; and that they had no

Wheleh\1 *et al. vs.* The State of Georgia, *ex rel.* Wiley *et al.*

chartered rights thereto, but were usurpers of the rights, privileges and franchises of owners and proprietors of public bridges :

*Held,* that the petition made a proper case for an information in the nature of a *quo warranto* and was not demurrable.

2. The information is not confined to strictly following the petition of the relators, but may amplify and enlarge the facts and the prayer, not going out of the substantial subject-matter complained of and the judgment granting the prayer and directing the information filed.

3. The answer to such an information denied that the respondents claimed to be a body corporate or to have chartered rights, or that they are usurping such rights. It admitted that they erected the bridge and had placed gates across it, and were exacting tolls from those who crossed; it claimed the bridge as their private property, and alleged that the public road only extended to the bridge on either side; that the land on both sides was either owned by them or by those who had granted the use of it to them; that they partly paid for and partly built the bridge; that certain persons raised small sums by subscription, and relators, with one of the respondents, contracted with a builder who built the bridge; that the landowners on both sides did not dedicate the bridge to the public, but were willing for the public to build the bridge and pay for it; that it was not paid for, and the builder retained possession with their consent; that he filed a mechanic's lien and transferred it to certain persons; that they did not dedicate the bridge to the public, but left it open for one year in order to give citizens an opportunity to pay for it; that they then sued relators, who represented that they were authorized to act for all who had contributed, and obtained judgment and sold the bridge, and respondents bought it :

*Held,* that on the pleadings, no evidence being introduced, a judgment ousting respondents of the right or privilege of charging tolls was right.

(*a.*) The act of 1850 (Cobb's Dig., p. 958; Code §684) merely grants the privilege to an owner of land on both sides of a stream to pass from one side to the other by a private bridge or ferry, and as incident thereto to pass others upon the payment of toll. It did not contemplate a case where a public road crossed a bridge, and where a few men obtained possession in the manner set out in this case and proceeded to charge toll without authority granted to them from some proper source.

March 9, 1886.

Roads and Bridges. Pleadings. Franchises. *Quo Warranto.* Before Judge ESTES. Hall Superior Court. August Term, 1885.

Reported in the decision.

H. H. PERRY, by brief, for plaintiffs in error.

W. S. ERWIN, solicitor general; G. H. PRIOR; M. L. SMITH; W. S. PICKRELL, by brief, *contra.*

JACKSON, Chief Justice.

Application was made by the relators to file an information in the nature of a *quo warranto* against the respondents, calling upon them to show by what right they exercised the franchise of using a public bridge as their private property, and erecting gates and charging toll for crossing the same. The application was granted and the information was filed by the solicitor general. Both the application and information were demurred to, and the demurrers overruled, and respondents excepted. The information was then answered on the merits; no issue was made on the answer, but on the facts as made by the pleadings, the answer included, the judge decided in favor of the relators and granted the writ of ouster, and respondents again excepted.

Thus three points are made: first, is the application demurrable? Secondly, is the information demurrable? And thirdly, is the judgment of ouster right?

1. Is the application demurrable? Or, in other words, will information in the nature of a *quo warranto* lie in the case made by the facts set out in the petition?

The facts therein exhibited are that on the 14th of March, 1879, the court of ordinary established a public road running from a church to this bridge across the Chattahoochee river, and on the same day, that court established another public road from the opposite side of the bridge to the city of Gainesville; that these roads were opened and worked, and traveled ever since as public roads; that the relators with other citizens by private subscription built the bridge and the public used it as a public bridge from

March, 1879, to July, 1879; that in July, 1879, respondents put up gates thereto and exacted tolls from the public; that they had no chartered rights thereto, but were usurpers of the rights, privileges and franchises of owners and proprietors of public bridges under the laws of the state; and therefore relators pray for the rule *nisi* against the respondents.

So that the case made is that a bridge was built over the Chattahoochee river by private subscription, and on its being built, or simultaneously with the erection, a public road from a certain church to Gainesville was authorized and established by the ordinary, and opened and used by the public in common with this bridge from its erection in March, 1879, to July, 1879, when this alleged usurpation took place; the gates were erected to prevent the public from passing over the bridge freely and without toll, and they were so prevented unless the toll was paid.

In such a case, we think that the information in the nature of a *quo warranto* does lie, and the petition therefor was properly and legally considered, and the prayer to show cause granted according to law. 3 Blackstone's Com. (Chitty), 263 ; 4 *Idem*, 312, 441. There it is said by the eminent commentator that the " writ of *quo warranto* is in the nature of a writ of right for the king against him who claims or usurps any office, franchise or liberty, to inquire by what authority he supports his claim in order to determine his right; . . . being a writ commanding the defendant to show by what warrant he exercises such a franchise, having never had any grant of it, or having forfeited it by neglect or abuse."

Afterwards, by the effect of the decision on *quo warranto* being final without new trial or appeal, the information in the nature of the writ of *quo warranto*, being a wider and less arbitrary proceeding, took its place, and is " applied to the mere purpose of trying the civil right, seizing the franchise or ousting the wrongful possessor."

The facts declared in this petition, making the case of a public bridge, built by private subscription to connect two public roads established the same day by the ordinary, present tho respondents as usurpers of this bridge, and as exercising absolute control of it as private property and the franchise of charging toll thereon without authority of law, and leaves no doubt, we think, that the remedy by information in the nature of *quo warranto* is appropriate and necessary.

2. The demurrer to the information filed by the solicitor general rests upon the ground, first, that it does not follow the application, but enlarges the same. We do not understand that the officer of the state who is required *ex officio* to prepare the information and make out the declaration on which the state, *ex relatione* of the relators, rests its case is narrowed to the rigid rule of strictly following the petition of the relators. He may amplify and enlarge the facts and the prayer, not going out of the substantial subject-matter complained of before the judge and the judgment granting the prayer and directing the information filed. Secondly, it alleges that, even with the original petition or application, the two together make no case for the writ or a judgment of ouster. It will be seen above that we differ from the learned counsel for plaintiffs in error, because we hold that the petition alone makes a sufficient case. The information enlarges and strengthens the petition, in that it expressly charges that the bridge was built for the free use of the public, and was used and accepted as such free bridge by the public, but respondents, without lawful warrant or authority, took possession of it, etc., and have no chartered right or other lawful authority to seize or erect gates and exact toll thereon.

3. The answer denies that they claim to be a body corporate, or to have chartered rights, or that they are usurping such rights. It admits that they had erected and were maintaining the bridge known as the new bridge over the

Chattahoochee; that they had a gate across it, and exacted tolls from all who crossed; that the bridge is their private property; that it had been partly paid for and partly built by them; that the Chattahoochee is not there a navigable stream; that the land on both sides of the river is either owned by them or by those who have granted the use of it to them; that the public road only extended to the bridge on either side, but did not embrace it; that the orders establishing these roads showed that they extended only to the bridge; it denies that it was built by the public or dedicated to the public, or accepted by the public or any public officer as a free bridge. It then sets up the history of the building the bridge; that relators, with one of the respondents, after certain persons had raised a small subscription, contracted with King to build the bridge; King built it, but they did not pay him. The land-owners were, on one side, Davis and Jordan Whelchel; on the other, John Whelchel. That they did not dedicate the same to the public, but were willing for the public to build the bridge and pay for it. As it was not paid for, King retained possession by consent of these land-owners, and never gave it up; that he filed a mechanic's lien on it for $1,078.57, which was due in February, 1879; that he transferred the lien to Davis Whelchel, Jordan Whelchel and Allen D. Candler, who paid him the said amount, and he turned over the bridge to them; that they continued to hold the bridge by consent of the land-owners; they did not dedicate it, but left it open for one year, in order to give citizens an opportunity to pay for it; that they did not pay for it; that these transferees then sued relators and another on the lien and got judgment; that relators represented that they were authorized to act for all who had contributed at all to build the bridge; that they, respondents, bought it and were put in possession, etc. And this is the title they set up.

Thereupon the court entered the following judgment:

"Whereupon it is considered, ordered and adjudged that the re-

spondents, Davis Whelchel, R. E. Green and A. G. Whelchel, having failed to show any charter, license or other sufficient authority to demand, collect or receive toll for the privilege of crossing the bridge mentioned in the pleadings, be, and they are hereby ousted of the right or privilege of charging, demanding or collecting toll in any manner from persons for crossing said bridge."

And the question is, is this judgment right?

It unquestionably is apparent from this entire record that the two public roads terminating at this bridge were really but one public road for public use to the county site of Hall county, the city of Gainesville, from Harmony Grove church and that portion of the county of Hall; that this road was established and opened for a public road a free public road; that the bridge was erected at that time, and without it the public use of the road, and therefore the road itself as a free public road, was virtually destroyed; that people had contributed to build the bridge; that they did not have or raise enough to build it or pay for it; that certain persons,—by what authority is not shown, except that of the land-owners,—completed it by hiring a man to build it; that this man got a lien on it,—by what law or as against what lawful owners of the bridge, is not shown; that three persons bought his lien, and sued these relators and another, and got judgment, by virtue of which the bridge was sold and respondents bought it.

Thus it is clear that they fail to show any charter or license to close this bridge by a gate and exact toll, and the court below was clearly right in so adjudging. Do they show any other lawful authority to exercise this franchise?

The act of 1850 (Cobb's Digest, p. 958, codified in section 684) grants authority to the owner of any land through which a stream may pass, on both sides thereof, to establish a ferry or bridge and charge toll. But the act should be construed strictly, and cannot be extended to embrace any man who buys the right to land a bridge or abut it on both sides of the river. It is a mere privilege given the owner to pass from one side of the river to the other

on his own farm by a private ferry or bridge, and as inci-
dental thereto to pass others across the stream upon pay-
ment of toll. The statute never contemplated a case where
a public road crossed a river over a bridge like this, and
when the bridge was not fully paid for by the public who
contributed to it, thereupon a few men, by arrangement
with various land-owners on both sides, by giving them the
right to pass free of toll or otherwise, could contract with
a workman to build it, give him a lien upon it, sell the
bridge thereunder, buy it, and turn it into a public toll-
bridge, without charter or authority of some sort from the
proper authorities. The power rests with the ordinary to
license such bridge, ferry, turnpike or causeway for a lim-
ited time, and to fix the rates of toll thereon, unless the
legislature intervene by charter. Code, §670, sub-sections
3, 4, 5. Unless one be the owner of land on both sides of
the stream, and thus gets authority under the act of 1850,
he must get such franchise or license from the general
assembly by·charter or from the ordinary, under the acts
of 1806 and 1818. Cobb's Digest, pp. 945, 952, codified
in section 670 of the Code of Georgia.

When not the owner of both sides of the stream, and
when possessed of no legislative grant, and when he has
no license from the ordinary, one who exercises such a
franchise or privilege does it without lawful authority;
and on an information in the nature of a *quo warranto*, he
will be ousted from the exercise of the privilege upon a
bridge, or causeway, or ferry, or turnpike on a public road,
or connecting two public roads over a stream, thereby
making one public road from a section of the county to
the site of the court-house thereof.

Such being the law under our own statutes, it becomes
unnecessary to look elsewhere for law upon the facts which
this record discloses.

Judgment affirmed.