Isaac F. Lamoreaux v. Adolphus A. Ellis, Attorney General.

*Quo warranto—Parties—Mandamus—Sheriff—Vacancy— Citizenship—Evidence.*

1. While an information in the nature of a *quo warranto* to test the right to hold a public office ought generally to be filed in the circuit court (*Coon v. Attorney General*, 42 Mich. 65), the facts that the office in controversy is that of sheriff, and that the prosecuting attorney has declined to file such an information, afford sufficient grounds for seeking relief through the Attorney General in the Supreme Court.

2. A citizen, tax-payer, and elector of the county has the right to set the machinery of the law in motion, and to compel the prosecuting attorney or the Attorney General, upon a proper and *prima facie* showing, to file an information in the nature of a *quo warranto* to test the right of the incumbent to hold the office of sheriff.

3. Leave to a private relator to file an information in the nature of a *quo warranto* under How. Stat. § 8662 (subd. 2), should not be granted without a responsible showing of relator's rights in the premises.

4. The Attorney General ought not to institute *quo warranto* proceedings upon the relation of a citizen having no claim of title to the office, unless the showing is such as to afford reasonable grounds for the belief that the incumbent of the office

is an intruder therein, or one not competent under the Constitution to hold it.

5. Upon the expiration of the second continuous term of office of a sheriff, all of his deputies and the under-sheriff go out with him.

6. How. Stat. § 582, which provides that whenever a vacancy occurs in the office of sheriff the under-sheriff shall in all things execute the office of sheriff until a sheriff is elected and qualified, does not apply to a case where the vacancy arises because of the ineligibility of the person elected as sheriff to fill the office.

7. A soldier in the Continental army, who lived in the United States at and after the time of the Declaration of Independence and the treaty of peace between the United States and Great Britain, which was signed September 3, 1783, was, by virtue thereof, a citizen of the United States, as was his son who was born in the United States while his father was a citizen, and whose citizenship would not be affected by the after-renunciation of allegiance by the father.

8. While the declarations of a deceased person shown to have been legitimately related by blood to the person to whom they relate, or by the husband or wife of such a person, are admissible as primary proof of *pedigree*, such relationship, if questioned, must be shown by other evidence than such declarations.

*Mandamus.* Submitted November 11, 1891. Denied December 21, 1891.

Relator applied for *mandamus* to compel respondent to file an information in the nature of a *quo warranto* to determine the right to hold the office of sheriff of Kent county. The facts are stated in the opinion.

*Smiley & Earle* and *Stuart & Knappen,* for relator.

*A. A. Ellis,* Attorney General (*L. G. Rutherford,* of counsel), for respondent.

MORSE, J. This is an application for a writ of *mandamus* against the Attorney General, commanding him to sign and file in this Court an information in the nature of a *quo warranto* against John McQueen to determine the

right of the said John McQueen to the office of sheriff
of the county of Kent. It is alleged and appears as a
fact that the prosecuting attorney of that county, as well
as the Attorney General, has refused, and still refuses,
to sign or file such an information, which has been duly
presented to each of them.

Lamoreaux, the relator, was a candidate for sheriff on
the Republican ticket at the general election in 1890,
and received 10,361 votes. McQueen was the Democratic
candidate for the same office at the same time, and
received 11,438 votes. He was declared elected, having
the highest number of votes, and qualified and entered
upon the duties of the office, and has ever since been,
and now is, acting as sheriff.

Lamoreaux was under-sheriff on the 31st day of Decem-
ber, 1890, by virtue of his appointment to that position
by Loomis K. Bishop, who had been sheriff of the county
for two terms immediately preceding the beginning of
the term to which McQueen was elected. Bishop, by the
express language of the Constitution, was "incapable of
holding the office of sheriff" after the said 31st day of
December, 1890. Article 10, § 5. In the absence of any
statute to the contrary, Lamoreaux could not hold the
office of under-sheriff after Bishop's term expired. His
appointment would die with the close of Bishop's hold-
ing. The statute provides that whenever a vacancy
occurs in the office of sheriff in any county the under-
sheriff of said county shall in all things execute the
office of sheriff until a sheriff shall be elected and qual-
ified. How. Stat. § 582. The vacancy, if any, in this
case would not, in my opinion, be such a vacancy as is
contemplated by this statute. In the statute relating to
vacancies and defining them, no provision is made for a
case like the present. See How. Stat. § 649; *Lawrence
v. Hanley*, 84 Mich. 404, 405. This would be a case where

the full term is to be supplied because the person elected to fill such term is ineligible.   On the 1st day of January, 1891, in this case, there could be no under-sheriff to hold over.   Bishop's authority to hold the office of sheriff expired at midnight of December 31, 1890, by constitutional limitation, and all his deputies and the under-sheriff went out of office with him.   The vacancy could have been filled by a special election, and a coroner might have acted as sheriff in the interim, but Lamoreaux could not have lawfully held over; or the county clerk and prosecuting attorney might have appointed some suitable person to perform the duties of the office for the time being.   How. Stat. § 663.   Nor has the relator any rights in the premises resulting from his being a candidate for sheriff and receiving the next highest number of votes for that office.   He therefore could not file an information in his own behalf to try McQueen's title to the office.

The first question to be considered is, has he the right, as a citizen, elector, and tax-payer of Kent county, to set the machinery of the law in motion, and to compel the prosecuting attorney or the Attorney General, upon a proper and *prima facie* showing, to institute proceedings in the nature of a *quo warranto* to test the right of McQueen to hold this office?   It is submitted by the Attorney General that the public only are concerned in this matter, and that he, as the agent and official of the public, cannot be required against his better judgment to file a *quo warranto* to oust any incumbent from a public office; that at the most it is within his discretion, and that he cannot be compelled, unless it appears that he has abused such discretion.

In the case of *Andres v. Ottawa Circuit Judge,* 77 Mich. 85, it was contended that Andres, who claimed that he was legally elected sheriff of Ottawa county, could not

file an information under the statute to test his right to hold that office without the consent of the circuit judge, and that the action of the circuit judge could not be reviewed in this Court when he had refused leave to file such information on the ground that it was a matter of public concern, and not of private right; and it was argued that, unless the prosecuting attorney or Attorney General saw fit· to file such information upon his relation, he was powerless to move in any way to obtain the office, unless the circuit judge was pleased to grant him leave to file an information on his own account. As the case was disposed of upon another ground, nothing was said in the opinion as to this contention, but the fact that the case was heard and disposed of upon the merits would imply that the Court did not consider it a good one.

If the Attorney General and prosecuting attorney can refuse, for no good reason, to file an information of this kind upon the relation of one who claims that he was legally elected to an office, or of any elector, citizen, and tax-payer, who is interested in the due administration of public affairs, then it may happen that, if both of these officers belong to the same political party as the incumbent of the office, they would for that reason refuse to move in the matter, and keep in any county office for the full term a person not legally elected or legally qualified to hold it. The law, of course, presumes that every public officer will do his duty without fear or favor or partisan bias, and this is found to be the general rule; but the current history of our day is full of instances of such intense party feeling that persons are frequently applying to the courts—the last resort—for the protection and enforcement of rights denied to them for partisan and political reasons only. The history of this State is no exception to the history of other states in this Union,

and one of the greatest dangers now threatening the maintenance of our free institutions is the frequent overriding of law and justice for partisan advantage and political control. I shall not be one to increase the danger, by holding that the courts are powerless to review the discretion of their officers, and all officers, in this class of cases, unless the organic law plainly forbids our interference. The public are vitally concerned in every election. What particular individual shall hold a particular office is not of so much consequence, but it is vital to the existence of a free government that there shall be a free, legal ballot, and an honest count; and that no one shall be permitted to hold an office not legally elected thereto, or qualified under the Constitution to hold it, if any elector and tax-payer shall object. Every honest citizen is interested and concerned in this matter, and has a legal right to be so. The courts ought not to consent to any holding which will put the power arbitrarily and without remedy or redress into the hands of any one, two, or three men to prevent a candidate for office from establishing his election to any office, or any citizen from inquiry in good faith into the rights of any person to hold an office. This would certainly be the result of the position taken by the Attorney General. There is no way except by proceedings in *quo warranto* to try the title to an office or oust an usurper therefrom.

In *Coon v. Attorney General*, 42 Mich. 65, the question was raised, but not decided, whether this Court would, under any circumstances, compel the Attorney General to file an information against his own judgment, and it was said that proceedings by information ought generally to be instituted in the circuit court. In this case, however, the facts that the office of sheriff is the one in controversy, and that the prosecuting attorney has declined to file an information, afford sufficient grounds for seeking

relief through the Attorney General, and in this Court.

It was held in *Attorney General v. James*, 73 Mich. 234, that the Attorney General could properly file an information to ascertain by what authority James held and exercised the office of superintendent of the poor of Wayne county, on the relation of a citizen and tax-payer of the county, who was interested in knowing that the proper officers made disposition of the funds he contributed by taxation to the support of the poor in his county. If the relator in this case is a proper party to act as relator in a *quo warranto* proceeding to try the title of McQueen to the office of sheriff, as he would be under the ruling in *Attorney General v. James, supra,* then it follows that he has a right to insist upon the filing of such information, if he has made in good faith a proper showing to warrant such filing.

It was held in *Vrooman v. Michie*, 69 Mich. 42, that a certain showing must be made where a private relator asks leave to file this class of informations. This showing must also be made when a court is called upon to compel a public officer, such as the prosecuting attorney or Attorney General, to file such an information. As was said in that case:

"Courts can never act unless upon some responsible showing, and, as it is contrary to public policy to allow persons to be needlessly annoyed by vexatious claims, the statute which has long existed in England, while it allows the public representative, who is the attorney general, or some other high official, to proceed *ex officio,* does not, as construed, permit a relator to proceed without exacting a very precise and positive showing. It has been held by the king's bench that a chief object in requiring leave is to prevent vexatious prosecutions; and the rule is inflexible that there must be affidavits so full and positive from persons knowing the facts as to make out a clear case of right in such a way that perjury may be brought if any material allegation is false. *Rex v. Harwood,* 2 East, 180; *Rex v. Sargent,* 5 Term R. 469; 1 Cole, Crim. Inf. 115;

*Rex v. Wardroper*, 4 Burrows, 1964; *Rex v. Dawes*, Id. 2122; *Rex v. Parry*, 6 Adol. & E. 810.   The practice also requires that the respondent may have an opportunity of making a counter-showing; and the relator is not allowed to proceed without showing, not merely a good case in law against respondent, but also that public policy will be subserved by the proceedings.   *Rex v. Stacey*, 1 Term R. 2; *Rex v. Mein*, 3 Id. 597; Willcock, Mun. Corp. §§ 378, 379, 397."

The showing of the relator in this case is made upon a number of affidavits, all obtained by one James E. McBride, an attorney residing in Grand Rapids, from the relatives of John McQueen and other people residing in Canada.   It is shown by the counter-affidavits of five of these persons that they did not sign or swear to the affidavits as they are now written, or, if they did, that McBride misrepresented their contents to them.   Some of them affirm that McBride also misrepresented to them his object in obtaining the affidavits, and that they supposed from such representations that the affidavits were to prevent McQueen losing his land in Kent county, instead of the purpose for which they are now being used.   These five affidavits cannot be relied upon, and must pass out of the case.   The affidavits and counter-affidavits of these five persons will not be considered in our determination of the matter.

The case attempted to be made against John McQueen is that he is not a citizen of the United States, but an alien, born in Canada, of British parentage, and owing allegiance to Great Britain, which he has never formally renounced according to our laws.   It is claimed that his great-grandfather, Alexander McQueen, was a native of Scotland, and was born about the year 1711.   He came to America, and served as a British soldier in the French and Indian war, and was with General Wolfe at the battle of Quebec.   After the war he settled in Ontario,

and lived and died there. His son Daniel, grandfather of John, was born in Ontario, and was a British soldier, and wounded at Bunker Hill. He lived in Ontario all his life, and died in the township of Woodhouse, Norfolk county. He and his father, Alexander, are buried on the McQueen farm in that township. Jacob McQueen, son of Daniel and father of John, was born in Ontario, and first settled for himself at Fingall, Elgin county. There he met and married Dorothy Mitchell, a native of the United States. In 1851 he moved from Fingall to Gosfield, in the county of Essex, where he died in 1874, at the age of 76 years. He then was a British subject, and voted at the Canadian elections. John McQueen was born in Fingall, and lived in Canada until after he was of age, and has never been naturalized. The proof of this claim by affidavits is substantially as follows:

Joseph Coatsworth swears that he was township clerk of Gosfield from 1857 to 1880. First knew Jacob McQueen between 1851 and 1860, and for several years thereafter. To the best of his knowledge and belief Jacob McQueen voted at all municipal and county elections, and exercised the rights of a Canadian citizen. Never heard his citizenship in Canada questioned. Coatsworth is now dead.

Henry Upcott says he is 38 years old, and was born in Gosfield. Knew Jacob and John McQueen. Jacob lived in Gosfield as long as deponent can remember up to the time of his death, in 1874. Supposed him to be a British subject, and citizen of Canada. Believes that John McQueen was between 23 and 25 years of age when he last saw him in Gosfield. Knows he was over 20 years old.

John Cascadan says that he has resided in Gosfield about 41 years, except in 1860 and 1861, when he was in Michigan. Acquainted with Jacob McQueen since 1838. Heard him say that he came to Fingall from at or near Port Dover, Ont., when he was young, at which time he lived in Fingall. Saw Jacob McQueen attend elections and take part therein. Always understood he was a

citizen of Canada, and never heard of his vote being questioned or challenged.

It is shown by a copy of the inscription on the head-board over the grave of Jacob McQueen that he died in February, 1874, aged 76 years and 5 months; so that he must have been born in 1797, if the inscription is correct.

William E. Wagstaff swears that he has lived in Gosfield since 1849. Knew Jacob McQueen, who, he thinks, came there between 1850 and 1853. Prior to 1874 he believes a voters' list was not used in the county, but the assessment rolls were used as a voters' list, and in the earlier days voting was open. Knows that Jacob McQueen was a qualified voter in the township and county while he lived there, and remembers that he adhered to the Liberal party. Always supposed him to be a British subject.

Levi Fowler says that he has lived in Fingall over 70 years; that he knew Daniel McQueen, father of Jacob; that he knew Jacob first about the year 1820; that while he lived in Fingall he voted at all elections, and exercised all the rights and privileges of a natural-born British subject. He was often voted for as a municipal officer. Understood from him and other members of the family that he was born in the Niagara district, in the province of Ontario, but where he is unable to state. Fowler died before the refusal of the Attorney General to act.

Henry McQueen swears that he was brought up by Hugh McQueen, a son of Daniel McQueen. The deponent is a son of William H. Dewey, but he took the name of McQueen, and is so called. He is 35 years old, and lived with said Hugh McQueen until the latter's death. Alex-ander McQueen, father of Daniel, Daniel, and Hugh are all buried on the old McQueen farm in the town of Wood-house, Ont. He says that he had in his possession, until two years ago, when he lost it, the old head-board that used to stand over the grave of Alexander McQueen. He took a copy of the inscription upon said board, and gives it, to wit: "Erected to the memory of Alexander McQueen, a native of Scotland, who was with the valiant General Wolfe at the conquest of Quebec, after receiving twenty-one wounds in various actions. Departed this life July 10, 1804, in the 93d year of his age." Deponent says that this monument was erected by Daniel McQueen, son of the deceased. Has heard Hugh McQueen say that

his brother Jacob McQueen was born in Ontario; that said Jacob came, with his father, Daniel, to Port Dover, in said province, in 1804, and always lived in Canada after that.

William H. Dewey, father of said Henry McQueen, says that he came to Port Dover in 1844, and lived with Daniel McQueen and his son Hugh McQueen; that he knew Jacob McQueen, who visited his father, Daniel McQueen, while deponent was there. Has often heard Hugh and Daniel speak of their early life. Heard Daniel say that his father, Alexander McQueen, was wounded 21 times while in the French and English war, and with General Wolfe at Quebec. Has often heard Hugh and Jacob speak of being born in the Niagara district of Ontario, and, so long as he knew them, they lived in that province. Has seen a severe saber wound or sword cut across the abdomen of Daniel McQueen, which Daniel said, when he showed it, he received in the battle of Bunker Hill, during the Revolutionary war, in which he was a British soldier.

Alexander McQueen swears that he is 51 years old, and a son of Alexander McQueen, a brother of Jacob McQueen. Has in his possession a copy of the inscription upon the old head-board over the grave of his great-grandfather, Alexander McQueen, and it is the same as given by Henry McQueen. Always heard and understood that his Uncle Jacob was born and always lived in Ontario.

Edward McQueen, a brother of the above-named deponent, Alexander McQueen, says that he is 60 years of age. He gives the same inscription upon the head-board of his great-grandfather, Alexander McQueen, from memory, as do the others from copies. He is informed from oral family history that said Alexander McQueen came with his son Daniel from near Fort Erie, in Ontario, in 1803 or 1804, shortly before Alexander died. Jacob McQueen was then only five years old, and deponent's father was two years old. Is certain from such family history that "Jacob was born, raised, lived, and died in this province [Ontario], and always remained a subject of Great Britain." Has also understood from such family history that Daniel McQueen, father of Jacob, and deponent's grandfather, was wounded across the abdomen at the battle of Bunker Hill. Understood that he was born in Ontario, and lived in the Niagara district.

The counter-affidavits show the following facts:

John McQueen, making affidavit in his own behalf, says that he has resided in Michigan since he was 18 years of age. His earliest business transaction of record was the purchase of a farm in Kent county in 1867. Has been a resident of Kent county, Mich., 25 years, during which time he has held the following offices: Justice of the peace, two terms; president of the village of Caledonia; township treasurer, three terms; school trustee, 15 years; and township clerk of Caledonia,— each time taking the constitutional oath of office, and never doubting that he was a citizen of the State of Michigan, and until this time such citizenship has never been questioned.

"That he is acquainted with the history of his grandfather's and father's family, having heard the same talked over a great many times, from his earliest infancy up to the time of his coming to the United States, in the year 1862; and from the family records and other traditions which have come to him this deponent avers the following to be the facts relating thereto:

"That Daniel McQueen, grandfather of this deponent, was born on the Atlantic ocean, near the coast of Maine, while his father and mother were emigrating from Scotland to this country, in the year 1755; that he went with his parents to the state of Pennsylvania, then a colony of Great Britain, where he resided with his parents until he attained his majority; that he married in said state of Pennsylvania, and raised a large family; that among the children of said Daniel McQueen was Jacob McQueen, the father of this deponent; that said Daniel McQueen's family continued to reside in Pennsylvania from the year 1755 until the year 1807; that in the year 1807 the said Daniel McQueen moved to the province of Ontario, Canada, but this deponent says that his said grandfather, Daniel McQueen, was a resident of the state of Pennsylvania when the Declaration of Independence was declared; that he always adhered to the cause of the American colonies, and was a soldier in the Continental army from the colony of Pennsylvania during the last years of the Revolutionary war, and that he never renounced his allegiance to the United States.

"That said Jacob McQueen, father of this deponent, was born in Pennsylvania, in the year 1797, and remained

in said state of Pennsylvania until the year 1807, when he removed with his parents to the province of Ontario; that in the year 1818, or about the time he attained his majority, .he returned from Ontario to the then village of Lockport, in the state of New York, and resided at Lockport and at the city of Rochester, New York, until 1828, when he again returned to Canada, and was married to an American woman, who was a citizen of the United States, named Dorothy Mitchell, in the year 1829; that while the said Jacob McQueen lived at Lockport and Rochester, New York, he always exercised the elective franchise of a citizen of the United States, and always voted and participated in the elections there, as he often stated in the presence of this deponent and his brothers and sisters while they were children at home; that said Jacob McQueen, while he resided in Canada, after his return from the state of New York, never took part in any of the affairs of the government, never voted, but always claimed his allegiance to the United States; that it was always understood that said Jacob McQueen was an American citizen, and this deponent well remembers having often been called a 'rebel' and a 'Yankee' while a youth in Canada, because of his father's adherence to the government of the United States."

That Dewey, Alexander McQueen, Edward McQueen, and Henry McQueen, whose affidavits are attached to the petition of Lamoreaux, are not to his knowledge and belief relatives of his, and that he never heard of them until he read their alleged affidavits. He states that his father, mother, grandfather, grandmother, and all his uncles and aunts are dead; that he has one brother living, Daniel McQueen, of Gaines, Kent county, Mich., and three sisters, to wit, Phœbe J. Fulmer, Nancy Orton, and Dorothy McDonald, the two latter being the youngest members of the family, and 43 and 41 years of age, respectively.

His sister Phœbe J. Fulmer also makes affidavit, in which she fully corroborates the affidavit of John McQueen as to the history of the family, as obtained by her from her father and mother. She is 56 years old, and the oldest member of the family now living. She resides at Windsor. She says her father never claimed to be a citizen of Canada, and never voted within any province of the dominion; that John left Canada, and settled in Detroit, when he was between 17 and 18 years of age,

occasionally coming home for a temporary stay until he went to Kent county, where he married in 1868.

William H. Drake swears that he lives in Kingsville, Ont., and was born in St. Thomas, in that province; that his father, Phineas Drake, was born in the county of Tioga, state of Pennsylvania, from there removing to Ontario; that he knew Jacob McQueen; that deponent's father was well acquainted with said Jacob McQueen and his father, Daniel McQueen, when said Jacob and his father lived in Tioga county, Penn. Has often heard his father speak about the place where he and Jacob McQueen came from in Pennsylvania; that they were neighbors, and well acquainted while living in the United States, and afterwards renewed their acquaintance while deponent's father was living in St. Thomas, and Jacob McQueen in Fingall.

If Daniel McQueen, the grandfather of John, was a soldier in the Continental army, and lived in the United States at and after the time of the Declaration of Independence and the treaty of peace between the United States and Great Britain, which was signed September 3, 1783, he was, by virtue thereof, a citizen of the United States; and, if he never renounced his allegiance, he died such a citizen. And, whether he renounced such allegiance or not after he went to Canada, Jacob McQueen would still have been a citizen of the United States, if he was born in Pennsylvania while his father was a citizen. It will be seen that the case as made by the relator fails to show where Daniel was born or where Jacob was born. Daniel is first known in Canada, in the affidavits attached to relator's petition, in 1803 or 1804, at which time Jacob was about five years old. Daniel and Jacob came to what is now known as the "Old McQueen Place." Daniel brought his father with him. John McQueen's version brings them into Canada from Pennsylvania in the year 1807, when Jacob was 10 years old.

A notable circumstance in relation to the proofs of the relator is this: It appears without contradiction by John

McQueen that Alexander McQueen, his great-grandfather, and Daniel, his grandfather, both lie buried in the town of Woodhouse, in the county of Norfolk, Ont. The inscription upon the head-board of Alexander McQueen is given, as is also those upon the grave-stones over the bodies of the father and the mother of John McQueen, who are buried in Gosfield. One witness, Edward McQueen, says in his affidavit:

" He, my said grandfather, my grandmother McQueen, and my uncle Hugh McQueen, and four others lie buried in the old family lot in the south-east corner of lot 10 in said concession, and I saw sketches of their grave-stones in the hands of Mr. James E. McBride, of Grand Rapids, Michigan, who visited me recently at my house to obtain these facts."

It would thus appear that McBride, who collected the evidence for the relator, made or obtained a sketch of the grave-stone of Daniel McQueen. The witness does not swear whether the sketch was correct or not. It is probable that the inscription upon the head-stone of Daniel McQueen would show when and where he died, and his age, and perhaps the place of his nativity, as did that of his father, Alexander McQueen. McBride, however, is not sworn, nor are these sketches produced.

The material inquiries are, where was Daniel McQueen, and what was his *status* as to citizenship, when Jacob was born? Was Jacob McQueen born in the United States while his father was an American citizen? And, if so, did he ever renounce his allegiance to the United States? Upon these inquiries we have nothing but hearsay on either side. But this hearsay evidence is admissible as primary proof when the declarations are made by a deceased person, shown to be legitimately related by blood to the person to whom they relate, or by the husband or wife of such a person. But this relationship, if questioned, must be shown by other evidence than the

declarations of the deceased person, whose declarations as to pedigree are sought to be admitted. The fact that Jacob McQueen voted in Canada would not, of necessity, constitute him a British subject. This fact, however, is disputed by those who ought to know the truth of the matter. The information acquired by John McQueen and his sister, coming direct from their father, is better evidence than that furnished by the relator. It is evident that John McQueen, as he says, was advised and believed from the first that he was an American citizen, as he has voted and held office for nearly, if not quite, a quarter of a century in Michigan.

Under the holdings of this Court in *Vrooman v. Michie,* 69 Mich. 42, the relator has not made out such a case as warrants the interference of this Court with the action of the Attorney General. The Attorney General ought not to institute proceedings by *quo warranto* upon the relation of a citizen having no claim of title to the office, unless the showing is such as to afford reasonable grounds for the belief that the incumbent of the office is an intruder therein, or one not competent under the Constitution to hold it. We are satisfied that not only is there no "precise and positive showing" such as the law requires, but that the evidence produced in support of the relator's claim, taken in connection with the counter-affidavits, does not afford any reasonable ground for the belief that such proceedings would result in the determination that John McQueen is an alien.

The writ will be denied, with costs.

The other Justices concurred.