PASCAGOULA STREET RAILWAY & POWER COMPANY v. CHRISTIAN BRONDUM.

[50 South. 97.]

1. STREET RAILWAYS. *Collisions. Evidence. Injury resulting from moving cars. Code 1906, § 1985. Presumption.*

Code 1906, § 1985, providing that, in actions against railroads for damages to persons or property, proof of injury inflicted by the running of locomotives or cars shall be *prima facie* evidence of want of reasonable care, does not apply to a street railroad.

2. SAME. *Construction of track. Negligence.*

The rails of all street railways ought to be flush with the surface of the street or road on which they are laid.

3. SAME. *Appeals. Harmless error. Erroneous instruction.*

Where, in an action against a street railway company for the death of a child struck by a car, the evidence showed that the child either stumbled over a rail negligently allowed to be elevated above the surface of the street, and was struck by the car, or was struck by the car without having stumbled, while the car was negligently operated, the error in an instruction announcing that the death of the child by the running of the car was *prima facie* evidence of negligence, authorizing a recovery, etc., was not prejudicial.

4. SAME. *Negligence. Contributory negligence. Children.*

A child six years of age, killed by a street car, cannot be charged with contributory negligence, so as to defeat an action by the parents for negligent death.

FROM the circuit court of Jackson county.

HON. WILLIAM H. HARDY, Judge.

Brondum, appellee, was plaintiff in the court below; the Street Railway & Power Company, appellant, a corporation,

was defendant there. From a judgment in favor of plaintiff for $6,000, the defendant appealed to the supreme court.

The suit was for the alleged wrongful death of plaintiff's daughter, a child about six years old. The company operated an electric car line in Pascagoula, and its track along one of the streets passed in front of a public school house At the time of the injury a large number of the school children were playing near the school building, at the noon recess, and in their games several of them, in chasing each other, went beyond the school limits and into the street, among them appellee's daughter. While thus playing, and running in the street, she stumbled in attempting to cross the street car track, and fell in front of a rapidly approaching street car, and was run over by it and so seriously injured that she shortly thereafter died from her injuries. The street was straight, and the evidence showed that the motorman in control of the car could have seen any person in the street for a distance of from one hundred to two hundred yards ahead of him. The car, when it struck appellee's daughter, was running at a speed of seven miles per hour. It was shown that one of the car brakes was defective, that the motorman did not attempt to stop the car until within fifteen feet of the child, and that the car could not, in its defective condition, be stopped, even with proper effort, in a shorter distance than forty to forty-five feet. It was questionable whether or not the child stumbled over the railroad track, but she fell while crossing the track. One of the rails of the track was elevated about three inches above the surface of the street, and the other rail was about one inch above the surface, in violation of the company's franchise, granted by the city, requiring the rails of the track to be flush with the street.

*Flowers & Whitfield* and *Ford, White & Ford,* for appellant.

We think the court need go no further into this case than is necessary to consider the first instruction given for plaintiff. This instruction is based upon Code 1906, § 1985. It was

given upon the idea that Code 1906, § 1985, applies to street railway companies; that such companies are included in the general words "railroad companies" employed by the statute. This statute was never intended to be used in actions against street railway companies, and we doubt whether it was ever attempted to be so used before. There are several reasons why it cannot be applied to street railways. In fact, the very life of the statute is jeopardized by extending it to such railways.

(a) In the first place, at the time this rule was adopted into the statutes of this state, the lawmakers knew nothing of street railways. The statute was first enacted in 1876. Laws 1876, p. 34. At the time there was not an electric street railway in the world. It was brought forward as Code 1880, § 1059, and appeared in the chapter on railroad corporations. It was after the adoption of the Code of 1880 that experiments with electricity began to furnish some promise of the use of it as a power to move cars along tracks. It was not until 1888, twelve years after the adoption of our statute, that the first electric railway was successfully operated. The section then came forward into the Code of 1892, appearing there as section 1808. At that time there was not an electric railway in the state of Mississippi, nor was there until several years later. So it appears that the legislature could not possibly have been aiming at any difficulties found to exist in the prosecution of suits against electric railway companies. There was no evil of that kind to cure. It can hardly be said that they were passing laws with respect to something they had never heard of. When that body used the words "railroad companies," they had in mind only such railroads as they were acquainted with; that is, they used the words with their ordinary meaning.

It is proper, in construing a statute of doubtful meaning, to look to the history of it and find out with what subjects the lawmakers had had experience at the time the law was passed. *Funk v. St. Paul, etc., Railroad Co.,* 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. Rep. 608; *Lincoln Street Railway Co. v. McClellan,* 54 Neb. 672, 74 N. W. 1074, 64 Am.

,St. Rep. 736. These words "railroad companies" came into
this law with a well-understood meaning. They referred to
nothing but the ordinary commercial steam railroad company.
The statute has not been changed in this regard since electric
railways came into use in this state. The legislature of 1906
changed the section at the end so as to make it apply to passen-
gers and employes. There was some change, too, in the act of
1876 when it was brought forward into the Code of 1880; but
the words "railroad companies" have been preserved through-
out. As far as our books show, this is the first attempt to apply
it to street railway companies. It has seemed to be the opinion
of the bar of the state that it was intended for use only in suits
against the ordinary commercial railroads. The statute men-
tions "locomotives" and "cars." Street railways do not have
locomotives. The use of this term is some evidence of the
meaning of the statute. The authors of this statute had in
mind the railroad train, made up of locomotives and cars.

(b) Words used in a statute by a legislature, whose members
are taken from the people, are usually given their ordinary well-
understood meaning. The words "railroad companies" are or-
dinarily understood to embrace those companies which own and
operate great commercial lines of traffic, and which run over
their lines trains of cars drawn by locomotives propelled by
steam. While it may not be material what kind of power is
used, the general idea is of a heavy locomotive drawing long
trains over long distances at a high rate of speed. Our legis-
lature separates the two kinds of carriers very clearly. When
our legislature is dealing with street railways, it expressly says
so. When it deals with railroad companies in general it does
not expressly exclude electric railway companies, but assumes
that they are not embraced within the general provisions deal-
ing with railroads. Section 328 of the Code of 1906 author-
izes the board of supervisors to permit "street railways" to be
constructed along the public roads. Under chapter 24 of the
Code of 1906 corporations for every lawful purpose may be

chartered, except those for the operation of railroads and for the carrying on of insurance business.  Street railway corporations may be chartered under this general chapter; but there is another and special provision in the chapter on railroads for the incorporation of railroad companies.  In the chapter on privilege taxes railroads are taxed in one manner under section 3856, and street railways in another manner under section 3874. Chapter 118 of the Code deals with "Railroads."  Practically every section of that chapter refers to steam railroads operated over long distances.  In fact, no section up to 4059 has reference to street railways.  Sections 4059 to 4062, inclusive, expressly refer to street railways.  With the exception of these four, nothing in the said chapter affects the rights, duties, or liabilities of street railway companies.  When we come to the chapter on "Revenue," we find, in section 4382, "each railroad company owning and operating a railroad" shall do certain things.  But this is not regarded, nor treated as having any application to street railways.  The property of railroads in general is assessed by the state railroad commission, but that of street railroad companies is assessed by the county authorities; and then the railroad companies supervised by the state commission under chapter 139 of the Code are those operating the ordinary commercial steam railroads.

The legislature uses the word "railroad" all through the Code as referring only to the lines which are ordinarily referred to as railroads.  In section 4884 we find some slight evidence that the legislature considered that there might be some uncertainty about the use of this term, or that street railways might be included in the general words "common carriers," and therefore thought it safe to expressly exclude street railways.  But it is evidently too plain for argument that the established meaning of "railroad" is a line of iron rails stretching for long distances and over which steam locomotives draw long trains of cars at a great rate of speed, carrying freight and passengers from one part of the country to another.  The power of the owners of the

said property; the great money value of such property; the hazardous nature of the business of operating such property; the great number of people engaged in its operation; the necessity and constancy of its use by the public—these considerations call for special laws dealing with the rights, duties, and liabilities of railroad companies. In the public mind that class of transportation is entirely distinct and different from that conducted by the class known as street railways. In this state the two kinds of property are clearly distinguished in the mind of the people. When the legislature deals with street railways, it expressly says so. When it deals with the other class, it uses the general term "railroad."

(c) And our legislature, in using the words "railroad companies" with the meaning which excludes street railways, not only gave these words their ordinary meaning as employed by the people in this state, but with the same signification recognized in other states. In fact, this is their popular and technical meaning. Text-writers prepare volumes on "Street Railways" and other volumes on "Railroads." The Encyclopedias do not discuss the two subjects at the same time. In *State v. Duluth Gas & Water Co.,* 76 Minn. 96, 78 N. W. 1032, 57 L. R. A. 63, it was held that under the revenue laws of that state a street railway corporation was not a "railroad company." The court said: "All through our statutes the legislature has uniformly, so far as we have discovered, used the word 'railroad' or 'railway,' when unqualified, as referring exclusively to ordinary commercial railroads; while, on the other hand, when they have intended to refer to street railroads they have qualified the word 'railroad' by the prefix 'street.' "

"Every railroad company, as aforesaid, shall be liable for all damages inflicted upon the person of passengers while being transported over the road, except in cases where the injury done arises from the criminal negligence of the person injured, or where the injury complained of shall be the violation of some express rule or regulation of said road actually brought to his or

her notice." Section 3, art. 1, c. 72, Comp. St. Neb. 1897. The supreme court of Nebraska discussed this section in *Lincoln Street Ry. Co. v. McClellan*, 54 Neb. 672, 74 N. W. 1074, 69 Am. St. Rep. 736, and held that it did not apply to street railways. Among other things the court said:

"When this law was enacted there was neither occasion nor demand for legislation of this character in the interest of tramway passengers. The means then employed for their transportation was the old-fashioned lagging horse car, in which the transit was not only safe, but peculiarly free from every suggestion of peril. Cable traction had not yet come into use, and electricity as a propulsive power was not within the dreams of legislative philosophy, and had no existence anywhere save, perhaps, as a dim possibility in the minds of some ardent theorists. In the common understanding, a railroad and a street railway have always been separate and distinct things. One is a graded road over which heavy cars, running on iron or steel tracks and usually propelled by steam, carry passengers, freight, and baggage; while the other is exclusively employed for the transportation of passengers in cities, and is so constructed as to interfere but little with ordinary traffic. Elliott on Roads and Streets, 557; *Funk v. St. Paul City Ry. Co.*, 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. Rep. 608; *Louisville, etc., R. R. Co. v. Louisville City Ry. Co.*, 2 Duv. (Ky.) 175. In the case last mentioned it is said: 'A railroad and a street railroad or railway, are, in both their technical and popular import, as distinct and different as a road and a street, or as a bridge and a railroad bridge.' And in *Bloxham v. Consumers' Electric, etc., Ry. Co.*, 36 Fla. 519, 18 South. 444, 29 L. R. A. 507, 51 Am. St. Rep. 44, the court say: 'The word "railroad" as generally used, applies to commercial railways engaged in the transportation of freight and passengers for long distances, and, as a general rule, having steam engines for motive power, and making stops at regular stations for the receipt and discharge of freight and passengers. The term "street railroad"

applies only to such roads, the rails of which are laid to confrom to the grade and surface of the street, and which is otherwise constructed so that the public are not excluded from the street as a public highway, which runs at a moderate speed compared with commercial railroads, which carries no freight, but only passengers from one part of a thickly populated district to another in a town or city and its suburbs, and for that purpose runs its cars at short intervals, stopping at street crossings or places irregularly, as the convenience of its patrons may require, for the receipt and discharge of its passengers.' " See, also, *Funk v. St. Paul, etc., R. R. Co., supra.*

(d) But the consideration which we think alone sufficient to support our proposition that Code 1906, § 1985, has no reference to street railway companies, is that the legislature could not regard the business of street railways as being of the same kind or class as railroad business. This section 1985 is class legislation. It may be justified; but it must be upon the ground that it applies to a class of litigants whose inherent nature or whose business warrants the legislature in placing them in a class to themselves for the purpose of such special legislation. It provides a rule of evidence to be used in the trial of cases against railroad companies which cannot be used in the trial of cases against any other class of defendants. It is really a new rule of evidence, in use in a very few states. It is necessarily of legislative creation. Every classification must be based upon some difference which makes the legislation reasonable. The legislation must deal with a subject which involves the difference. "The classification must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed." Code 1906, § 1985, is of the same character as section 193 of the constitution and Code 1906, § 4056. They are all class legislation. They all apply to railroad companies. They all place railroad companies in a class to themselves for the purpose of such special laws. They recognize an inherent peculiarity of the rail-

road business which makes it reasonable and necessary to place such companies in a class alone. The peculiarity of the railroad business, which justifies that classification made for the purpose of enacting section 4056, must justify the enactment of section 1985.

In *Ballard v. Mississippi Cotton Oil Co.,* 81 Miss. 533, 34 South. 532, 62 L. R. A. 407, 95 Am. St. Rep. 476, our court said that the characteristic of the railroad business, which warrants the legislature in abolishing the fellow-servant rule in certain respects, is the necessary peril attendant upon the operation of railroad trains. So many persons are engaged in the operation of railroad trains. The work is necessarily dangerous under the most favorable conditions. Employes are so placed as to be at the mercy of other employes. They are frequently injured through the negligence of persons whom they cannot watch. The hazardous nature of the work which railroad employes have to perform is held by our court, following the supreme court of the United States, to furnish a basis for the classification for the purpose of passing special laws to protect persons whose safety is imperiled by this inherent peculiarity of the work. The legislature recognizes these characteristics. Persons employed in the operation of trains on railroads were thought to need more protection from the law than persons engaged in any other business. The courts have examined this special legislation, and have determined that the difference between the operation of railroads and the carrying on of other kinds of business is such as to warrant the classification made.

And in *Bradford Construction Co. v. Heflin,* 88 Miss. 314, 42 South. 174, 12 L. R. A. (N. S.) 1040, the court held that, since railroad companies have been put into a class to themselves for the purpose of this special legislation because the business in which they are engaged is peculiarly hazardous the reason for the classification must be constantly kept in mind; that employes cannot claim the benefit of this special legislation simply be-

cause they are employed by railroads; that where the reason fails the classification must fail; that the employes sought to be helped are such only as are in need of help; that no employe can claim the benefit of the special enactment whose safety is not imperiled by the hazards peculiar to railroading. And the court went further in this last case, and said that the employes of corporations operating dummy lines, or construction roads, or logging roads are not entitled to the protection. The business of such companies may be as hazardous; but it is not so large. The evils are not so general, and do not demand special legislation for the protection of persons engaged by them. So it appears that the courts uphold this special legislation with respect only to employes engaged in the hazardous part of railroading, and in the hazardous part of such railroading only as is general and extensive. Only the employes of the great common carriers owned by railroad corporations can claim the benefit of Code 1906, § 1985. The holding in the *Bradford Construction Co. case* was explained further and reaffirmed in *Mobile, etc. R. Co. v. Hicks,* 91 Miss. 273, 46 South. 360, 124 Am. St. Rep. 679.

It follows inevitably that our court would never say that the employes of street railways can claim any right under section 4056. In confining that section to railroad corporations proper, the court does not even have to call to its aid the general rule that statutes in derogation of the common law are to be strictly construed, though this in itself would be sufficient, perhaps; but such limitation upon the use of that section is necessary to preserve it. The reason for the classification must be constantly kept in mind. The classification must itself be protected. If the difference used as a basis for the classification should be disregarded, the classification itself must fail, and the special legislation fail with it.

The supreme court of Missouri in *Sams v. St. Louis M. R. R. Co.,* 174 Mo. 53, 73 S. W. 686, 61 L. R. A. 475, construed a statute of that state, passed in 1897, reading as follows: "That

every railroad corporation owning and operating a railroad in this state shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroads by reason of the negligence of any other agent or servant thereof: Provided, that it may be shown in defense that the person injured was guilty of negligence." After a very full consideration it was held that the statute was not intended to apply to street railways. Among other things the court said: "Men engaged in the operation of street railroads are exposed to hazards, but not to peculiar hazards, which distinguish men engaged in operating steam railroads, and which have made them a class for special legislation."

In *Funk v. St. Paul, etc., R. R. Co.;* 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. Rep. 608, the court construed a statute as follows: "Every railroad corporation owning or operating a railroad in this state shall be liable for all damages sustained by any agent or servant thereof by reason of the negligence of any other agent or servant thereof without contributory negligence on his part, when sustained in this state." The law was passed in 1857 and construed in 1895. The court held that it did not apply to street railways.

See, also, the following authorities: *Lincoln Street Railway Co. v. McClellan, supra; Georgia Ry. & Electric Light Co. v. Joiner,* 120 Ga. 905, 48 S. E. 336; *Bridge Co. et al. v. Iron Co.,* 59 Ohio St. 179, 184 et seq., 52 N. E. 192; *State v. Cain,* 69 Kan. 16, 76 Pac. 433; *North Hudson County R. R. Co. v. Flanagan,* 57 N. J. Law, 236, 30 Atl. 476; *Lax v. Railroad Co.,* 46 N. Y. Super. Ct. 448.

It appears that the Georgia supreme court has held otherwise. *Railway Co. v. Williams,* 117 Ga. 414, 43 S. E. 751, 61 L. R. A. 249. But it will appear from an examination of the opinion of the court in that case that it is unsound, if our decisions in the *Ballard case* and the *Bradford Construction Company* and *Hicks cases* are correct. The Georgia court recognizes no necessity for any reasonable basis of classification.

The court does not even notice the decisions of the supreme court of the United States upon which our decisions are based.

Our proposition here is that Code 1906, § 1985, is the same kind of class legislation as Code 1906, § 4056; that it must be justified by the same reasoning; that the peculiarity of the business of railroading, which is taken for the basis of the classification to justify section 4056, must also be used to uphold section 1985. Injuries to persons and property incident to the running of railroad trains and locomotives are so frequent and general, injuries from this cause so far exceed in number injuries from any other cause, railroads traverse wide stretches of territory, and trains are handled by servants of the owners. In section 1985 the legislature is attempting to mitigate some of the evils of railroading by making it easier to recover damages. The evils sought to be to some extent mollified by this section are those growing out of the distinguishing peculiarity of the railroad business; that is, its well-known dangerous character. There are other occupations which are dangerous; but they are not so prominent and general, and the injuries which they cause to persons and property are not so frequent and serious as to call for special legislation. The classification underlying this special statute is the same as that which underlies section 4056. It certainly can be said with no more reason that street railways may be put in the same class with railroad corporations proper, in order to uphold this section, than that they could be put in the same class with such railroad corporations for the purpose of applying to them the fellow-servant rule adopted by section 193 of the Constitution, and Code 1906, § 4056.

Railroad corporations proper own lines extending across states; street railways are usually confined to single municipalities. Railroads cover miles; when street railways cover feet. The street railway usually has a single light car, running alone; while steam railroads have heavy locomotives, drawing from one to forty cars, each of which is many times heavier than a single street car. The railroad train crosses long distances, where no

one is present to see an injury but the employes; but street cars ordinarily run only along thickly populated streets. The street car rarely exceeds ten miles per hour; while the railroad train thunders along at forty miles per hour. The street car stops at every street crossing; while railroad stations are miles apart. The street car carries at best but three or four dozen people; while the railroad train carries its hundreds. The street car has no great momentum, even at its best, and can be stopped within a few feet; while the heavy railroad train cannot be suddenly stopped in an emergency. The railroad train carries its heavy load of freight and baggage, adding weight and momentum to the moving machinery; the street car has only a few passengers, and no freight and baggage. The railroad proper is constructed on high dumps across valleys, in deep cuts through hills, and on bridges across streams; the street car company has its rails laid level with the streets. The locomotive carries with it danger from fire; but no such danger attends the running street car.

All the above differences show the comparative safety of persons and property in the operation of street railways, viewed in the light of experience with railroad operation. There are many occupations more dangerous than the operation of street railways. There is none so generally dangerous, dangerous on so large a scale, as railroading. To hold that section 1985 applies to street railways would be to take out of it the very element which gives it validity and life. To so hold would be to place street railways in a class with railroad corporations proper. To do this would be to say that the operation of street railways is dangerous to persons and property, just as the operation of the great commercial railroads is. This would impair the classification—would destroy the basis.

We have already said that the same basis for the classification must be employed in justifying the enactment of this statute which has been held to justify section 193 of the Constitution. Counsel for appellee suggest that the fundamental rea-

son for the creation of a rule like that contained in Code 1906, § 1985, is that the employes of such companies are always present to testify for the master. If their suggestion is sound, then the basis for the classification would be that peculiarity of the business which makes it necessary to operate it through servants in the absence of the master. The reason for the classification would then be stated somewhat as follows: "The business is conducted by servants who are in the immediate charge of the machinery, ways, and appliances; the master is absent, but always of necessity has employes present on the scene of every casualty who stand ready to testify for him." This may be one reason which prompted the legislature in passing the law as it originally appeared in 1876. It may be a reason to be used in demonstrating the wisdom of the enactment; but the law cannot be safely based upon this ground and its validity maintained on this ground alone. Whether occupations could be classified by reference to such a basis need not be considered. Whether a law would be good which applied such a rule to all business conducted in the absence of the master need not here be decided. We have no law which attempts to do this.

Besides, if the conducting of business through employes in the absence of the master could be adopted as the basis for classification, the rule would have to apply to all businesses so conducted. The fact is nearly all enterprises are carried on through employes in the absence of the master. Especially is this true as to large enterprises, whose importance compels attention and treatment at the hands of legislators. Again, if such basis were employed, the rule would not be extended to employes themselves, as is attempted to be done by Code 1906, § 1985. The very idea in the mind of the lawmaker in adopting the general rule would prevent him from extending it to employes. The reason which would move him to vote for a law to create a presumption of negligence on the part of the master under certain circumstances—that is, because the absent master has present witnesses—would impel him to vote against

the law which would extend the same rule in the present employes.

If this basis should be used, then logging roads, tramways,. electric railways, sawmills, all sorts of manufacturing plants,. steamboats, cotton gins, in fact, every sort of business, would have to be embraced, provided only it is carried on in the absence of the master through employes. But this statute only applies to railroad corporations. We must, therefore, find something inherent in the railroad business, peculiar to it, distinguishing it from every other class, to justify the classification. This inherent peculiarity is found in the use by railroad corporations of ponderous machinery propelled by steam at a. high rate of speed over long distances upon a gigantic scale. The magnitude of the enterprise; the frequency of the casualities; the well-known peril of the business; the helplessness of persons and property that may come in contact with the moving machinery—these facts and considerations are held to warrant special legislation applying to railroad corporations only; legislation whose purpose is to protect life and property by making it easier to prove liability.

It may be that the legislature in passing this law had no such basis in mind. It may be that the authors of the statute did not think of any necessity for classification. It may be that their purpose was as stated by counsel for appellee, and that the only reason which prompted them in passing the law is that accidents from running trains frequently happen when there is no one present but the injured person or property and the employes; but, when the courts come to test such. enactments, they must find a basis which will justify the classification for the purpose of such special legislation.

Our position is that any classification for the purpose of special legislation like this in hand must be referred to the same basis upon which the classification is rested, to uphold section 193 of the Constitution; that any other basis would be unsound and would condemn the statute as arbitrary class leg-

islation.  *Connolly v. Union Sewer Pipe Co.,* 188 U. S. 540,
22 Sup. Ct. 431, 46 L. Ed. 679, and authorities cited therein.
Unless the same basis is used to justify the classification, the
said act is violative of the fourteenth amendment of the Consti-
tution of the United States, in that it denies the equal protec-
tion of the laws and the "protection of equal laws."

The error of the court in giving instruction No. 1 for the
plaintiff is therefore fatal.  The case is a close one on the facts.
The testimony of the eyewitnesses is in hopeless conflict.  This
instruction No. 1 was no doubt controlling.  It relieved the
jury of the necessity of deciding whether the employes of the
appellant company were in any wise at fault.  It relieved the
plaintiff of his burden of proof.  It placed the burden of
proof upon the defendant.  It saved the jury the trouble of
weighing the testimony and carefully ferreting out the truth
from conflicting stories.  The witnesses were children.  No
two saw the accident alike.  The instruction, however, fur-
nished to the jury a solution of the perplexing question by
authorizing them to cast it all aside and simply find that the
company had not exonerated itself.  It would be difficult to
frame up a case for presentation to this court in which the
issue could be more squarely and directly presented.  If Code
1906, § 1985, does not refer to street railways, then the giving
of instruction No. 1 for plaintiff was of necessity a reversible
error.

As this case is a very close one on its facts, the jury should
not have been permitted to infer that the mere fact of injury
to the child by the running of the electric car made a *prima
facie* case against the defendant company.

The fourth instruction for the plaintiff is to the effect that
if the evidence showed the moving car to be beyond the control
of the motorman, or that the west rail of the track was elevated
above the surface of the ground and caused the child to stumble,
and by reason of defective brakes and unreasonable speed or
by the aforesaid elevation of the rail and the stumbling, the

child was run over and killed, then the company should be held liable. This instruction should not have been given, for there is no evidence to show that the rail on the west side was higher than the surface of the ground. The accident did not occur at a public crossing or where pedestrians are supposed to walk. There was testimony that immediately next to the rails the dirt had been washed away by water or worn away by vehicles travelling along the road, but that within eighteen inches of the rail on both sides and outside of the track it was on a dead level. In any event no liability can be predicated of a person's striking his foot against the rail unless at a place where pedestrians are supposed to walk.

*Witherspoon & Witherspoon,* for appellee.

The ordinances and franchises under which the appellant railway company was operating in the city at the time of the injury, required that the rails of the track should be level with the surface of the ground. But through the negligence of the appellant the rails at the place where the child was killed had been so laid as to extend from one to two inches above the surface, and it was because of this that she stumbled and fell in front of the approaching car and was killed. If the appellant had obeyed the ordinances of the city with regard to the laying of the rails and maintenance of its track, this unfortunate tragedy would never have occurred. It was reasonable on the part of the city to require the rails of the street railway to be flush with the surface of the ground at those places where vehicles and pedestrians habitually cross the street.

There was no fender on the car, and one of the brakes was cracked and worn so thin that it had ceased to be effective. If this brake had been in good condition, it is possible that the car could have been stopped in time to have avoided the injury. The entire length of the car passed over the child, and the car did not stop until after it had passed onward a distance beyond the mangled body, estimated by the various witnesses at from fifteen to seventy-five feet. At the time of the acci-

dent the car had been running down grade and with constantly accelerating speed.   This was gross negligence inasmuch as the motorman knew that within a very short while the car would be passing along the edge of the school play grounds.   The motorman made no effort to check the speed of the car until it was almost upon its victim.

The child was only six years of age, hence cannot be charged with contributory negligence so as to defeat an action by the parents against appellant for negligently causing her death.

Code 1906, § 1985, applies to all railroad companies.   Code 1906, §§ 1594, 4891, define a railroad as including any person, natural or artificial, who is a common carrier.   Certainly a street car company is a common carrier for hire.   Opposing counsel err in stating that an electric railway system is exclusively employed for the transporation of passengers in cities. It is common knowledge that many towns in our state and elsewhere are connected by electric trolley lines which run for miles through the country.   Injuries to many persons resulting from the running of electric railway cars have happened at points far away from the habitation of men, and where there was no one to see and tell the cause of injury.   And to cases like this Code 1906, § 1985, is applicable.

*Denny & Denny,* on the same side.

That the car was in defective condition and running at a dangerous speed and not under the control of the motorman at the time of injury is apparent.   The brake of the car was shown without dispute to be defective, and the rails of the track were not flush with the surface of the ground, as they should have been.

The first instruction for the plaintiff, based on Code 1906, § 1985, was correctly given.   *New Orleans, etc., Co. v. Brooks,* 85 Miss. 269, 38 South. 40; *Louisville, etc., Co. v. Crominarity,* 86 Miss. 464, 38 South. 633; *Hopson v. Kansas City, etc., R. Co.,* 87 Miss. 789, 40 South. 872.

The purposes of the enactment of Code 1906, § 1985, Code

1892, § 1808, being laws 1876, p. 34, brought forward, which are so fully set forth in the brief of opposing counsel, apply with equal force to street railway companies as to steam railroad companies. Many injuries are inflicted by moving street cars in sparsely settled suburbs where there are no disinterested eye witnesses, and in the night time as well as in the day time. In *Phillips v. Vicksburg, etc., R. R. Co.,* 64 Miss. 693, this court stated that the statute in question was enacted to meet cases where the manner of the injury inflicted is not known to others than the employes of the railroad company, and it is equally applicable where many witnesses see the injury.

A motorman is not permitted to assume that a child of tender years when approaching a track, will not go thereon in front of his car, as he may assume in case of an adult. White's Supplement Thompson on Negligence, 256. See also 21 Am. & Eng. Ency. of Law (2d ed.) 487; *Isham v. Dew* (Vt.), 67 Am. St. Rep. 691; *Milwaukee R. R. Co. v. Kellog,* 94 U. S. 469; *Jamison v. Illinois, etc., R. Co.,* 63 Miss. 33.

Argued orally by *J. N. Flowers,* for appellant.

WHITFIELD, C. J., delivered the opinion of the court.

We are thoroughly satisfied that the first instruction given for the plaintiff is manifestly erroneous. That instruction is as follows: "The court instructs the jury, for plaintiff, that the undisputed evidence that the death of the daughter of plaintiff was caused by the running of the car of defendant is *prima facie* evidence of negligence on the part of defendant, authorizing a recovery by the plaintiff unless overcome by testimony exculpating defendant from negligence, to the satisfaction of the jury; that such *prima facie* proof of negligence or presumption of negligence cannot be overthrown by conjecture, but the circumstances of the accident must be clearly shown, and the facts so proven must exonerate the defendant from blame. And if such facts be not proven to your satisfaction, and the attendant circumstances

·of the accident remain doubtful in your minds, the defendant is not relieved from liability, and the presumption of negligence ·controls, and you should thereupon find for the plaintiff, and in such sum as the testimony warrants, not in excess of the amount ·sued for." Code 1906, § 1985, has no application to a street railway. The brief of learned counsel for appellant on this proposition amounts to demonstration of the inapplicability of this section of this statute at this time in this state. The authorities contained in that brief are so directly in point, and the reasoning so clear and satisfactory, that we direct the reporter to set out that part of said brief in full, and content ourselves by referring to it in support of the inapplicability of ·Code 1906, § 1985, to street railways, as the law now stands. Whether this section ought not to be changed so as to embrace street railways, if it can constitutionally be done, is a matter for the legislature.

But a careful and repeated examination of the testimony in this record satisfies us thoroughly that the giving of this instruction, whilst error, is not reversible error. Learned counsel for appellant insist that the case is a close one on its facts. We cannot concur in this view. We think the evidence clearly and convincingly shows liability on the part of the appellant company without regard to this instruction, and that no ·other verdict than one for the plaintiff could be rendered on any rational basis. It is true that two witnesses for the plaintiff testify that the little girl ran upon the track from the west side; but four witnesses for the plaintiff, and the motorman himself for the defendant, testified that she ran upon the track from the east side. And without regard to the testimony of any of these seven witnesses, the physical facts show, by the position of the girl where found, beyond any controversy, that she must have run upon the track from the east side. This is beyond any reasonable controversy. Learned counsel for appellant misconceive when they say there is no ·evidence to show that the rail on the west side was higher than

the surface of the ground. Two witnesses expressly so testified. In other words, the evidence makes it perfectly clear that the rail on the east side, at the point where the girl was killed, was from one to three inches higher than the surface of the street, and on the west side about one inch higher. Of course, it would be immaterial whether she entered from the east or west side on the track, if the proximate cause of death was the elevated condition of the track on either side, over which she stumbled, if the fact be that she did stumble. But the testimony in this case makes it perfectly plain that she entered upon the track from the east side. That is the overwhelming testimony of the witnesses testifying to what they observed, and it is made absolutely indisputable by the physical facts as to where the girl was found, and the position of her body when found. She must have entered from the east side, and whether she stumbled over the rail and fell and was thus killed, or whether she was struck by the car, not having stumbled, in either case the appellant was plainly liable for her death.

This car was coming downgrade, at a rate of from seven to ten miles an hour, right in front of a public school, on whose grounds nearby, between the rails and the school, some two hundred children were playing at noon recess. This motorman knew the railway track was constantly crossed by pedestrians, knew these children were constantly playing out there at all recess hours, knew the children were playing close to the track, and according to his own testimony never applied any brake to stop this car until within fifteen feet of the little girl, who was then running parallel with the track and near to it, so near as to advise him necessarily of her perilous position. There is some testimony that one of the brakes was worn to a feather edge, and could not be of any assistance in his effort to stop the car. There is testimony that he ought to have seen these children two hundred feet away. There is evidence that he tried to stop the car, but not until he was entirely too close to the child, and that he could not stop it for some reason. The

motorman himself testifies that he stopped once for some little boys.   He also testifies that this little girl was only fifteen feet from the car and thirteen feet from the track when he first saw her, that he was looking down the track on both sides, right ahead of him, and that she (the little girl) was coming toward the track, angling; that he was running about seven miles an hour, and that after he turned the current off entirely the car ran forty-five or fifty feet before he put on the brakes; and that it took the forty-five or fifty feet to stop the car, when this little girl was within a distance of seventeen feet from the track, and he had waited until that time to apply the brakes, when from the whole testimony it is overwhelmingly manifest that he did see, or ought to have seen, this little girl, at a distance of from one hundred to two hundred feet, straight down the track ahead of him, as she was running along the side of the track.

It is not to be tolerated, under circumstances such as these, that a street railway company shall be permitted in this reckless and wanton manner to run down and kill a young child. If it be true that she stumbled, there would have been no accident had the rails been flush, as the rails of all street railways ought to be, with the surface of the ground.   If she did not stumble the rate of speed at which this car was going, downgrade, by a public school, whose grounds near the track were thronged with children, who, to the knowledge of the motorman, were in the habit of crossing the track frequently, coupled with the fact that this motorman was bound to have seen this child from one hundred to two hundred feet away, whilst she was running alongside the track, within a distance estimated from two to ten feet, and running angling towards the track, and never applied the brakes until within fifteen feet of her, and had one brake wholly worthless constituted negligence of the most wilful, wanton, and reckless character.

This child was but six years of age, and contributory negligence is not in the case.

96 Miss.—4

We have carefully examined all other assignments of error, and content ourselves, not to protract this opinion uselessly, with observing that on the record in this case they are without merit, and that the judgment is *affirmed.*

Mayes, J., delivered the following dissenting opinion.

In this case the testimony would support a verdict for either party, and the court has not yet held that in such a case erroneous instructions, calculated to mislead the jury, would not cause a reversal. Indeed, in the case of *Brister v. Railroad Company,* 84 Miss. 33, 36 South. 142, the court expressly held that it would cause a reversal. If, on the facts of the case, it is manifest that no other verdict could or should be rendered than the one complained of, this court has held, in a line of decisions too numerous to be cited, that the cause would not be reversed for any mere error in the instructions, when it is manifest that the verdict is as it should be, and that the errors in the instructions were not potent in procuring the verdict. But the sustaining of the verdict in those cases was based by the court entirely upon facts contained in the record, making it impossible for any other verdict to be reached, and upon facts so conclusive in their nature that, if a different verdict had been reached, the court would not have allowed it to stand. This, I think, has been the consistent and correct holding of this court. The case under discussion was not a case where a peremptory instruction should have been given for the plaintiff. Indeed, after a protracted and most careful examination of this record, the facts and circumstances are far from making a case of clear liability on the part of the defendant company, but leave its liability in such doubt as could only be settled by the verdict of the jury. In this state of the proof the instruction complained of was given. I shall not quote the instruction, since it is set out in full in the main opinion. That opinion concedes that this instruction is "manifestly erroneous," but still holds that the giving of the instruction is not reversible error.

Without this vital error in giving this instruction, a verdict in favor of the plaintiff was possible; but on the giving of this instruction, a verdict against the plaintiff was impossible.   Can it ever be said, under such circumstances, that such an error in law is not reversible?   In the first place, the instruction gives a false probative effect to certain proven facts in the case, raising the comparatively insignificant fact of mere injury by the running of the car to a degree of proof sufficient to warrant the jury in finding a verdict for plaintiff.   In other words, the instruction creates a false quantum of proof on which to rest liability and then tells the jury, if they have any doubt as to how the injury occurred, they must find a verdict for plaintiff, resting their verdict on the mere fact of injury by the running of the car.   It was the duty of the plaintiff to prove negligence in order to entitle him to recover, and, if he failed to do this he failed to make out his case.   If, when all the testimony was in, the jury were in doubt as to how the accident occurred, it was their duty to find for defendant.   This instruction subverts the whole law applicable to the case, and its effect is just as though the court had given a peremptory instruction for plaintiff.   The rule is general that negligence is not to be presumed from the mere fact of injury, but must be established by the evidence; and yet the court tells the jury by this instruction that, when the plaintiff has shown that the death was caused by the running of the car, this fact alone was *prima facie* evidence of liability, and warranted a recovery against the defendant company, unless the testimony of the company overcame this presumption.   By this portion of the instruction a presumption of liability is created where none exists as a matter of law, and the instruction further requires proof on the part of the company to overcome this false presumption. But the instruction does not stop at this, but goes further and directs the jury that this false presumption of liability cannot be overthrown by conjecture, but can only be overcome by clear proof of such facts and circumstances as would show exoneration from blame on the part of the defendant company.   The

instruction does not stop here; but, growing more stringent as it proceeds, further tells the jury that if, after the production by the defendant company of all its facts and circumstances introduced to overcome this presumption raised by this instruction, the circumstances of the accident remain doubtful, it is the jury's duty to find for the plaintiff. It was impossible, under this instruction, for the jury to return any verdict save one for the plaintiff, though the testimony in the case fully warranted a verdict for either party. If this instruction was not the potent cause of the verdict in favor of plaintiff, it is certain that it barred the jury from rendering a verdict in favor of defendant. It may be that the jury would have rendered the same verdict without this instruction; but it is possible that, if this instruction had not been given, the verdict would have been in favor of defendant, and in either case, on the facts, the verdict would not have been disturbed.

I have not set out the facts, but request that the reporter make a full statement of same.