STATE ex rel. JORDAN, DIST. ATTY., v. MAYOR AND COMMISSIONERS OF CITY OF GREENWOOD.

(In Banc. March 31, 1930.)

[127 So. 704. No. 28339.]

(In Banc.  June 9, 1930.)

[129 So. 682. No. 28339.]

Suggestion of error overruled. For former opinion, see 127 So. 704.

**S. Rosenthal,** of Jackson, **Means Johnston** and **S. L. Gwin,** both of Greenwood, **Chapman, Moody & Johnson,** of Indianola, and **Arthur Jordan,** of Greenwood, for appellant.

838

**A. H. Bell** and **Alfred Stoner**, both of Greenwood, for appellee.

Argued orally by **Means Johnston** and **Simon Rosenthal**, for appellant, and by A. H. **Bell**, for appellee.

**Anderson, J.,** delivered the opinion of the court.

The state, on the relation of Arthur Jordan, district attorney for the Fourth judicial district of this state, in which the city of Greenwood, in Leflore county, is situated, filed in the circuit court of that county an information in the nature of a quo warranto against the appellees, John Ashcraft, G. B. Elliot, and J. B. Webb, mayor and councilmen of said city, to oust them from their offices on the ground that they were usurping the duties of their respective offices without warrant of law.

In the latter part of the year 1922, and the early part of 1923, the city of Greenwood attempted to incorporate within its limits the territory lying north of the Yazoo river known as North Greenwood. The ground of the petition was that these proceedings were void; that the territory known as North Greenwood, therefore never became a part of the city of Greenwood. When the petition was filed, one of the appellees, John Ashcraft, was the mayor of the city, and was a resident citizen of the territory attempted to be incorporated.

The petition set out fully the facts relied on as constituting the void proceedings by which North Greenwood was sought to be annexed, and charged that the appellees, as mayor and councilmen, were unlawfully exercising authority and jurisdiction over the said territory. The prayer of the petition was that the mayor and councilmen be "debarred as councilmen of the city of Greenwood from exercising jurisdiction over said territory described as aforesaid, and that said ordinance of annexation, dated December 5, 1922, be declared null and void, and that all the territory described in said ordi-

nance of annexation be declared outside of and no part of the city of Greenwood.

In addition to the general issue, the appellees filed four special pleas to which the appellant demurred on the ground of insufficiency in law, which demurrer was overruled, and the appellant declining to plead further, final judgment was entered in favor of appellees, from which judgment this appeal is prosecuted.

The case being here on pleas and demurrer thereto overruled, the facts set out in the pleas are to be treated as true.

The first special plea follows: "Now comes John Ashcraft, J. B. Webb, and G. P. Elliott, the defendants in the above-styled cause, by their attorneys, and for a plea in this behalf, says that the plaintiff ought not to have and maintain the aforesaid information in the nature of a quo warranto against them, because the defendant says that the city of Greenwood, Mississippi, was on the first day of January, 1922, a municipality duly organized and existing under the laws of the State of Mississippi, and operating and functioning as such municipality and for a long time theretofore and ever since said date has been, and now is duly operating and functioning as such municipality. That on the 7th day of October, 1922, the then Governor of the State of Mississippi, Lee M. Russell, issued his proclamation abolishing the alleged Town of North Greenwood, Le Flore County, Mississippi, so that if the said town ever existed the same was prior to the time of the extension of the corporate limits of the said city of Greenwood, completely destroyed and annihilated as such municipality. A copy of said proclamation is hereto attached and marked Exhibit 'A' to this plea, as a part hereof. That on the 5th day of December, 1922, the council of the said city of Greenwood passed an ordinance extending its limits including the territory theretofore supposed to embrace the limits of the said alleged town of North Greenwood; and that on the 16th day of January, 1929, the said council of the said city of Green-

wood passed an ordinance approving the boundaries as described in the said ordinance of December 5, 1922, and adjudicating the publication of the said ordinance as required by law, as shown by Exhibits 'D' and 'E' to relator's declaration and information. That the said territory so alleged to have been called North Greenwood was at the time of the extension of said city limits, and before, adjacent to territory embraced by the corporate limits of the said City of Greenwood, and being at the time of said extension separated only by the Yazoo River, the corporate limits of the said City of Greenwood extending to the south banks of said River and following and embracing said banks for at least a half a mile, and the said North Greenwood Territory extending to and embracing the north banks of said River and following said banks for at least one quarter of a mile, the boundaries of said territory being shown by the exhibits to relator's declaration and information herein and part of the territory annexed touches and abuts the original territory of the city of Greenwood, and the said territories are also connected by a large iron bridge, and its approach affording free and convenient access and passage between said two territories for pedestrians, automobiles, trucks, tractors, and all manner of traffic, except railroad trains, the said bridge being one of the largest, most magnificent and commodious in the State of Mississippi; that upon and immediately after the issuance of the proclamation signed by said Governor Lee Russell, shown as an exhibit to the said information filed by relator, and as Exhibit 'A' to the first special plea to the original complaint herein and hereby made a part hereof, the said alleged municipality of North Greenwood ceased to attempt even to operate as a town or municipality. There were no meetings of any persons styling themselves as mayor, aldermen, council, or by any other nomenclature applicable to municipal officials, that no taxes were levied by any other authorities styling themselves as officials of 'Town of North Greenwood,' and

no persons whatever purported to act as such officials, and no improvements were made in said alleged North Greenwood territory by any municipality or alleged municipality styling itself as North Greenwood, or by persons styling themselves as officials of North Greenwood, and that the property owners of said North Greenwood territory after the extension of the corporate limits of the city of Greenwood paid taxes to the said City of Greenwood, voted in its elections and generally recognized the said alleged North Greenwood territory as a part of the said City of Greenwood, and which said territory alleged as North Greenwood was at the time of said extension, and is now, very populous; that the officials of said City of Greenwood have, ever since said extension of said corporate limits of said City of Greenwood, treated and recognized the said North Greenwood territory as a part of the said City of Greenwood; that the streets of said added territory have been since said extension worked, drained, graveled and lighted by said city of Greenwood, and said added territory furnished by said City with police protection and public schools, and into said territory have extended water mains, erected fire plugs and furnished most of the inhabitants of said added territory with abundant water supply and fire protection, except as to water supply and fire protection in that part of said added territory known and called Boulevard Addition to North Greenwood, which could not be furnished by reason of reservations reserved by the original owners of said addition, which rights are now being sought by the said City of Greenwood in the Courts; that all of the territory described in said declaration or information has been ever since the said extension of the said corporate limits and is now functioning and operating under the control of and as a part of said City of Greenwood, in which control, functioning and operating the State of Mississippi has for more than six years acquiesced and during which said six years and more, large expenditures of money have been made

by the said City of Greenwood in and about the improvement of said territory, and all of its dealings have been upon the faith and confidence that the said added territory was a part of said City, and the defendant has served as Mayor of said City ever since January 3, 1927, and that on account of the said long acquiescence and failure of more than six years to question the said extension, and because of laches, the State is now estopped to question the validity of said extension through this proceedings against the Mayor and Commissioners duly elected by the citizens of said city, the election of the said Ashcraft being shown by a certified copy of the returns of the election commissioners of the said city of Greenwood electing this respondent, Ashcraft, to the office of Mayor of said City, filed as Exhibit 'B' to the first special plea to the original complaint herein and made a part hereof. And by this warrant the said John Ashcraft has held and executed during all the time in said information mentioned, and still holds and executes the said office of Mayor of the City of Greenwood, and said Webb and Elliot exercise rights over said added territory as they well might and still may; and that said Ashcraft does not now usurp the said office as by the said information he is above supposed. All of which the said John Ashcraft and said Webb and Elliot are ready to verify.''

The second plea set out substantially the same facts as the first, and, in addition, that if the town of North Greenwood was not abolished in 1922, it was automatically abolished by chapter 268, Laws of 1926. The third plea set up that no good would be accomplished by upsetting the present status of the city of Greenwood, but that only evil would result; that courts were organized for the purpose of doing justice and not injustice; that the disruption of the unity of the city of Greenwood would bring about incalculable hardships and confusion among the property owners of the entire territory constituting the city. The fourth special plea set up that

the organization of the city of Greenwood, as it now exists, and the extension of its municipal boundaries, were, in all respects, legal.

Among the exhibits to the petition is a certified copy of a petition from the office of the city clerk of Greenwood dated September 20, 1922, addressed to Governor Russell, asking that the town of North Greenwood be abolished on the ground that its municipal authorities had ceased to function for more than six consecutive months preceding the date of the petition, and reciting that it was signed by a majority of the qualified electors of the town of North Greenwood, and prayed that said town be abolished under the authority of section 3310, Code of 1906. Another exhibit to the petition is a certified copy of the Governor's proclamation abolishing the town of North Greenwood, dated October 7, 1922.

Under the law, a municipality cannot extend its boundaries so as to include another municipality. Gandsi v. Seminary, 95 Miss. 315, 48 So. 908; Fire Hose Co. v. Vicksburg, 117 Miss. 89, 77 So. 911; Pascagoula v. Krebs, 151 Miss. 676, 118 So. 286.

The appellant contends that under those decisions the proceedings to annex North Greenwood to the city of Greenwood were void, because North Greenwood was, at the time, an existing municipality; while the appellees contend that North Greenwood was not, at the time of its annexation, a separate municipality from the city of Greenwood, because it has been previously abolished as such.

We are of the opinion that the proceedings by which it was sought to abolish the municipality of North Greenwood were void; that it was, at the time of its attempted annexation to the city of Greenwood, a separate municipality; and that therefore the annexation proceedings were also void. We do not set out the facts embodied in the pleadings out of which these questions arise, and do not discuss the questions, for two reasons: First, because, in their nature, they are questions that will prob-

ably not arise in the future; and, second, the conclusion we have reached results in the affirmance of the judgment appealed from on another ground, which ground we shall now undertake to develop and discuss.

As set out in the special pleas, for nearly seven years prior to the beginning of this action, the city of Greenwood, as now constituted, has continued to function. Since the ordinance of annexation of North Greenwood to the city of Greenwood, on December 5, 1922, North Greenwood has ceased to function as a separate municipality. It has had no municipal officers of its own, and has taken no action whatever, of any kind or character, as a separate municipality. Its inhabitants are inhabitants of the enlarged city of Greenwood. Its qualified electors vote in the elections of the city of Greenwood. All municipal taxes against property in North Greenwood are assessed and collected by the municipal authorities of the city of Greenwood. The streets of North Greenwood have been lighted and graveled by the city of Greenwood, and the city of Greenwood furnishes police and fire protection to North Greenwood, and public schools. The city of Greenwood has extended its water mains into North Greenwood, erected fire plugs, and furnished the inhabitants of North Greenwood with water, fire protection, etc., except as to water and fire protection in that part of said territory known as Boulevard addition, which could not be furnished by reason of certain water rights of the original owners of that addition. The pleas also set out that the state had acquiesced in this condition of affairs for nearly seven years before bringing this action.

The appellees' position is that, although the city of Greenwood, as now constituted, be only a de facto municipal corporation, on account of the facts and conditions set out in the special pleas, the state is barred from now questioning its legality.

Section 4017, Code of 1906, section 3216, Hemingway's 1927 Code, provides that the remedy by informa-

tion in the nature of quo warranto "shall lie, in the name of the state against any person or corporation offending in the following cases." The statute then sets out eleven different cases in which the remedy shall lie. The first, fourth, and fifth of these are in this language: (1) "Whenever any person unlawfully holds or exercises the functions of any public office, civil or military, or franchise, or any office in any corporation, city, town, or village, and to try the right to any such office." (4) "Whenever any corporation shall be guilty of a misuser or abuse of its powers, or ceases to discharge the duty for which it was created." And (5) "whenever any corporation wilfully exercises powers not conferred by law."

In the absence of any statutory period of limitation, it is generally held by the courts of this country that an action in the nature of quo warranto on behalf of the public may be commenced at any time; that lapse of time constitutes no bar to the proceeding; that the maxim, "Nullum tempus occurrit regi," applies in such cases. However, the courts of several of the states of the Union, although recognizing and giving force to that maxim, hold that conditions may arise in the. administration of the affairs of a corporation, whether such corporation be public or private, by reason of which the state, on account of its laches in questioning the legality of the corporation, will be barred from so doing. One of the leading cases bearing on this question is that of State v. Des Moines, 96 Iowa, 521, 65 N. W. 818, 821, 31 L. R. A. 186, 59 Am. St. Rep. 381. The city of Des Moines incorporated within its limits some adjacent territory. The act of incorporation was void for reasons unnecessary to state. For four years thereafter, without any question by the state, the enlarged city exercised throughout its entire territory the rights and functions of city government, including the levying and collecting of taxes, establishing, opening, vacating, changing, and improving streets, and making contracts, and creating and paying

debts. Four years after the annexation of the territory, the state proceeded, by petition in the nature of quo warranto, to set aside and vacate the annexation proceedings. The case is so well reasoned and supported by authorities referred to in the opinion, that we do not see how we could do better than quote that part of the opinion bearing directly on the question at bar. It follows:

"It is hardly possible to contemplate the situation to result from a judgment dissolving the present city organization, and leaving the territory formerly embraced within corporate lines as it would be left. Of all the cases to which we are cited, involving the validity of municipal organizations, where the consequences to result from a judgment of avoidance are considered, not one presents a case of such uncertainty, nor where there are the same grounds for serious apprehension, because of difficulties in adjusting rights in this case. There are many cases where the doctrine of laches has been applied to sustain a municipal government where the organization, as attempted, was illegal. Much importance is attached by appellant to the fact that in this case the act serving as a basis for the annexation is absolutely void, and a distinction is drawn between proceedings where they are irregular, merely, and where they are void. The case of State v. Leatherman, 38 Ark. 81, is perhaps as directly in point on the particular question as any we have noticed. It involved a consideration of the legality of the establishment of Arkansas City, in that state. In Arkansas such corporations are established on the order of court, and it was found that the court making the order had no jurisdiction to make it, and as to that branch of the case the court said, 'There was no jurisdiction, and the order was void.' The court then proceeded to the consideration of the question we are now considering, and, after detailing some of the consequences to result from a judgment avoiding the corporation, it is said in the opinion, speaking of that city, with others, probably organized under similar orders, 'To declare

them all null, after long acquiescence on the part of the state, would open a very Pandora's box of litigation, and produce incalculable hardship and confusion.' In the same connection the court further said, 'This impels us to the broader fields of inquiry, whether this court, in view of justice, equity, and the security of titles, can find, in recognized principles of law, sufficient warrant for refusing its aid in opening the floodgates of unmitigable evil.' The question was, in that case, presented on a demurrer to the answer; the action being by information in the nature of quo warranto, as in this case. It may also be said that the information was presented by the attorney-general in behalf of the public, and not on the relation of a private prosecutor, as in this case. The opinion is concluded in these words: 'The case made by the answer shows an acquiescence for nearly nine years, and a recognition by the governor, county collector, and the whole of a population now over one thousand. If the answer be true, the corporation of Arkansas City should not now be held null and void.' Barring that of time, the same facts are true in this case; the time here being, before the commencement of the suit, a little more than four years. In connection with the thought as to delay on the part of the public, it may be well to say that our law expressly authorizes such actions to be commenced by the county attorney, in the name of the state, and makes it his duty to do so when directed by the governor, the general assembly, or a court of record. The general assembly has twice convened since the annexation, in the city affected by the act, the seat of government being within its limits; and the validity of the corporation has never been, by it, nor by any public officer, questioned. These suggestions bear on the fact of a public recognition of the present corporation. The Arkansas case cites, and we refer to, Jameson v. People, 16 Ill. 257, 63 Am. Dec. 304. That case, also, was quo warranto, in behalf of the state, to oust the officers of the town of Oquaka, because of illegality in the organization of the town. The claimed

illegality was an irregularity in the manner of voting on the question of incorporating. The validity of certain bonds issued by the town depended on the existence of the corporation. The question was presented by a demurrer to defendant's pleas, corresponding to our answer, in which it was made to appear that for more than four years the corporation had been recognized by the legislature in its acts; had exercised the powers and franchises conferred on such corporations by law; had levied and collected taxes, made contracts, and incurred liabilities, and passed and enforced ordinances. The supreme court declined to consider the matter of irregularity in voting, and sustained the corporation alone on the grounds of the averments of the answer or pleas; and, while it attached much importance to the subsequent acts of the Legislature in recognition of the corporation, it added, after detailing some consequences to result: 'Municipal corporations are created for the public good, —are demanded by the wants of the community; and the law, after long-continued use of corporate powers, and the public acquiescence, will indulge in presumptions in favor of their legal existence. . . . It would seem incompatible with good faith, and against public policy, although irregularities may have intervened in the organization of the town, now to hold that it was not a body corporate. We do not think the law requires us to do so. We realize the dissimilarity of the case, in some respects, from the one under consideration; but at the same time, in its reasoning and conclusion, it sustains the principle that laches may overcome legal defects in such organizations. People v. Maynard, 15 Mich. 463, is quo warranto, and the case involved the validity of a county organization which was held void, as we understand, by a majority of the court, on constitutional grounds. The court in that case says: 'Inasmuch as the arrangement there indicated had been acted upon for ten years before the recent legislation, and had been recognized as valid by all parties interested, it cannot now be disturbed.

Even in private associations, the acts of parties interested may often estop them from relying on legal objections which might have availed them if not waived. But in public affairs, where the people have organized themselves, under color of law, into ordinary municipal bodies, and go on, year after year, raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on the acquiescence as on the regularity of their origin, and no ex post facto inquiry can be permitted to undo their corporate existence. Whatever may be the rights of individuals before such acquiescence, the corporate standing of the community can be no longer open to question.' The case cites Rumsey v. People, 19 N. Y. 41, and Lanning v. Carpenter, 20 N. Y. 447. Mr. COOLEY, in his work on Constitutional Limitations (page 312, 4th Ed.) says: 'In proceedings where the question of whether a corporation exists or not arises collaterally, the courts will not permit its corporate character to be questioned, if it appears to be acting under color of law, and recognized by the state as such.' . . . And the rule, we apprehend, would be no different if the constitution itself prescribed the manner of incorporation. Even in such a case, proof that the corporation was acting as such, under legislative action, would be sufficient evidence of right, except as against the state, and private parties could not enter any question of regularity. And the state itself may justly be precluded, on principles of estoppel, from raising any such objection, where there has been long acquiescence and recognition.' This, it is true, is a direct proceeding by the state. And, while the language used is applied in part to collateral proceedings, it seems also to include actions by the state directly. The learned writer sustains this text by a reference to People v. Maynard, 15 Mich. 463; Rumsey v. People, 19 N. Y. 41, and Lanning v. Carpenter, 20 N. Y. 447. It will be seen that importance is given to the fact that the defective organization takes place under color of law.

Nothing less can be said of the annexation in this case than that it was made under color of law. 'Color of law' does not mean actual law. 'Color,' as a modifier, in legal parlance, means 'mere semblance of legal right.' Kin. Law Dict. & Gloss. In some of the cases the defects as to organization have been spoken of as irregularities, because of which appellant thinks the cases not applicable, because this is a void proceeding. The term 'irregularity' is oftener applied to forms or rules of procedure in practice than to a nonobservance of the law in other ways, but it has application to both. It is defined as a 'violation or nonobservance of established rules and practices.' The annexation in question was a legal right under the law, independent of the act held void. It was not a void thing, as if prohibited by law. The most that can be said is that the proceeding for annexation was not the one prescribed, but it was a violation or nonobservance of that rule or law. It seems to us that the proceeding is no less an irregularity than in the cases cited.''

To the same effect are the following cases: State v. Bailey, 19 Ind. 542; State v. Gordon, 87 Ind. 171; State v. Alexander, 129 Iowa 538, 105 N. W. 1021; State v. Westport, 116 Mo. 593, 22 S. W. 888; State v. Lincoln R. R. Co., 80 Neb. 333, 114 N. W. 422, 14 L. R. A. (N. S.) 336; State v. College View, 88 Neb. 232, 129 N. W. 296; State v. McLean County, 11 N. D. 356, 92 N. W. 385; Commonwealth v. Bala Turnpike Co., 153 Pa. 47, 25 A. 1105; People v. Alturas County, 6 Idaho 418, 55 P. 1067, 44 L. R. A. 122; State v. Mansfield, 99 Mo. App. 146, 72 S. W. 471, and State v. Bingham, 14 Ohio Cir. Ct. R. 245.

These cases do not apply the doctrine of laches and estoppel to the state as those terms are ordinarily defined in the decisions of the courts. They are based, rather, on the principle of the public welfare. Laches, however, is one of the elements that enters into the question. The very large question is whether the state, in its sovereign capacity, has the right, in a proceeding of this

character, to destroy instead of promote the public welfare. Here, we have a de facto municipal corporation exercising all the functions, and no more, so far as the record shows, of a de jure municipal corporation. The state stands alone upon the position that the city of Greenwood is guilty of breaching a bare legal right of the public. The governing principles in this case apply not only to public corporations—such political subdivisions of the state as counties and municipalities—but apply, as well, to private corporations chartered under the laws of the state. For illustration, take one of the counties of the state. It has been illegally organized as a county, because, in its organization, the law was not pursued. Nevertheless, it is a de facto county. It has functioned for years, issued bonds, built a courthouse, and has all the district and county officers which the law provides for counties legally organized. There have been chartered and organized in the county municipalities which have issued bonds for their various purposes, as provided by law. The board of supervisors has organized and put into operation drainage and road districts, etc., in accordance with the drainage and road laws, and has issued bonds for such taxing districts. Besides the election of its regular county and district officers, it has elected members of the State Legislature and has participated in all other state elections. There has been no abuse by the county of the powers conferred on counties by the law. The only complaint the state has for dissolving the county is the naked fact that the law was not complied with in the organization of the county. The attorney-general, in the name of the state, files a petition in the nature of a quo warranto against all the officers of the county requiring them to show by what warrant they hold their offices, or against the county itself to dissolve it and place it back into its original state. The sole ground for so doing is that, under the law, the organization of the county was void. There is no pretense that the public welfare would be promoted by the proceeding,

but, on the contrary, it is shown that incalculable harm will result to the public.

Are the courts powerless to prevent such a result? We say not. The rule of reason and justice will be applied here as was applied by this court in construing our anti-trust statute, which was afterwards, by the legislature, embodied in an amendment to the statute.

Take another illustration: There is a railroad corporation chartered under the laws of the state. It has been in operation for years, has its railroad lines in the state, is engaged in carrying passengers and freight, and has issued millions of dollars of bonds in its building and betterment. These bonds are held all over the country by purchasers, in good faith, for value. It turns out that, for some reason, the charter of the corporation is void. Nevertheless it is shown that the corporation is guilty of no abuse of the regular corporate powers generally conferred on railroad companies. It is true it is not a legal corporation, but it is a de facto corporation serving the public as if it were a de jure corporation. The only claim the state has for proceeding to vacate its charter and dissolve the corporation is the bare fact that its attempt to become a corporation is void because the law, in some respects, was not pursued. In such case, would the courts be powerless to render a just judgment by denying the state a judgment dissolving the corporation? The purpose of our statute conferring upon the attorney-general and the district attorneys of this state the power to bring quo warranto is to vindicate, not destroy, the rights of the public.

This is a new question in this state. The only decisions of our court coming anywise near to it are City of Jackson v. Merchants' Bank, 112 Miss. 537, 73 So. 573, and Ætna Ins. Co. v. Robertson, 131 Miss. 377, 94 So. 7, 95 So. 137. In the City of Jackson case the court held that where a city had erroneously run a street line, it would be estopped to change such line to its correct position, if such change necessitated damage to, or destruction of,

a building erected in accordance with the line so run. The grant by a state of the powers usually given to counties and municipalities is a grant of just so much of the sovereign power of the state. It would seem, therefore, that the same principles governing the enforcement of public rights by municipalities and counties would govern the state in the enforcement of its public rights.

The Ætna Insurance Company case was a suit by the state against the insurance company to recover penalties for violation of the anti-trust statute. There was much conflict in the opinions of the judges as to whether the state could be estopped by laches. The result of the judgment of the court, however, was to estop the state from recovering penalties for more than two years before the action was brought.

Appellant refers to the case of Fire Hose Co. v. Mayor and Board of Aldermen, of City of Vicksburg, 117 Miss. 89, 77 So. 911, 913, and Pascagoula v. Krebs, 151 Miss. 676, 118 So. 286, 287, as sustaining its position. We do not think these decisions are in point. The Fire Hose Company case was a suit against the city of Vicksburg for a debt that the village of Walters was due the Fire Hose Company. The village of Walters had been included within an addition to the corporate limits of the city of Vicksburg. When the addition was made, it was not known that any part of the village of Walters was included therein. In the opinion, the court laid stress on that fact, using this language: "It should be observed that there has never been any concerted effort on the part of the city of Vicksburg and the town of Walters to consolidate. . . . While the bill does not expressly so aver, it is manifest that the municipal authorities were ignorant of the fact that the Fort Hill Territory was wholly within the confines of the town of Walters. . . . The city of Vicksburg never intended to trespass upon the territory of the town of Walters, to appropriate any of its territory, or assume any of its debts."

In the Krebs case, there was no effort whatever on the part of the city of Pascagoula to exercise jurisdiction over the annexed territory. The inhabitants of the annexed territory sent their children to the *county schools;* the county, not the city of Pascagoula, maintained their roads and bridges, and furnished such police protection as they had. The court said in the opinion: "In fact, it did not seem that anybody in authority knew that this merger of Eastside into the municipality had been accomplished."

How different from the present case, where everybody knew that the merger had taken place, and acquiesced in it for more than six years prior to the bringing of this suit.

There is another reason to be added to those already set out (and a potent one it seems to us), why the state ought to be barred from maintaining this action, and that is that by chapter 268, Laws of 1926, the town of North Greenwood was automatically abolished. That act, in substance, provides that all municipalities in the state containing less than one thousand inhabitants as determined by the federal census of 1920, which have not functioned for a period of two years, shall be abolished and thereafter cease to exist. The record in this case shows that, by the census of 1920, North Greenwood contained less than one thousand inhabitants, and the record also shows that it has not functioned as a separate municipality since its territory was annexed to the city of Greenwood in the latter part of 1922. This statute embodies the public policy of this state in reference to municipalities of the character of North Greenwood. If the prayer of this petition in this case is granted, the city of Greenwood can now legally do what it failed to do in 1922, namely, it can incorporate within its boundaries the territory formerly constituting North Greenwood. It appears, therefore, that the whole object of this action is vain and useless.

Affirmed.

**Ethridge, J.,** delivered the dissenting opinion.

I agree with the majority opinion that, under the cases of Gandsi v. Seminary, 95 Miss. 315, 48 So. 908, Fire Hose Co. v. Vicksburg, 117 Miss. 89, 77 So. 911, and Pascagoula v. Krebs, 151 Miss. 676, 118 So. 286, the act of the Governor in undertaking to abolish the municipality of North Greenwood on petition of its citizens was unauthorized and void; and that, consequently, the city had no authority to annex the municipality of North Greenwood to itself. The act of the officers in undertaking to do so was clearly beyond their power, ultra vires, and void.

I do not agree, however, that the judgment should be affirmed on any theory of delay and changed conditions resulting from the unauthorized attempt to annex North Greenwood. Until the act of the legislature in 1926, the municipality of North Greenwood continued to be a municipal corporation, and there has been no act on the part of the city of Greenwood since the passage of this legislative act to annex the territory constituting the municipality of North Greenwood.

Section 104 of the Constitution of 1890, provides that: "Statutes of limitation in civil causes shall not run against the state, or any subdivision or municipal corporation thereof."

The purpose of this section of the Constitution was to take away the power from any agency of the government, to bar the state from bringing suit because of time. At the common law, the state was a favored suitor and was not barred by the lapse of time. See Parmilee v. McNutt, 1 Smedes & M. 179; Hill v. Josselyn, 13 Smedes & M. 597; City of Lexington v. Hoskins, 96 Miss. 163, 50 So. 561. In the last-named case, there was involved the right of the city of Lexington to use a strip of land as a part of the street. The county of Holmes, in which the city of Lexington is situated, was created in 1833, and was authorized to locate a county site within

three miles of the center. O. W. Beall and Samuel Long each agreed to donate thirty acres of land for this purpose, and in June, 1833, each executed a bond for title, afterwards, in 1841, giving a deed conveying the adjacent tracts, making sixty acres, to the board of police of the county; the recited consideration being the location of the county site. The land conveyed formed the basis of the site of the town of Lexington which was incorporated in 1836. Before its incorporation there had been a survey and plat of the land made by one Benjamin Griffin in 1833 under the direction of the board of police, which survey divided the land into lots and streets; the courthouse being the center. There was no record of the original plat, but what purports to be a copy thereof, made by Fleet C. Mercer, dated April 21, 1851, was recorded about that time in the office of the clerk of the chancery court, accompanied by the field notes of the survey of the town of Lexington, or a copy thereof, dated July 9, 1833. In 1908, M. W. Hoskins, who owned lot 104 in the town of Lexington, filed a bill against the city averring that the municipal authorities had recently made an order requiring that her fence be drawn in on the north side of her lot in order to widen or open what was claimed to be a street which the municipal authorities asserted to be forty feet wide. This street had been opened and used at twenty-three feet wide on one end, and twenty-seven feet nine inches wide at the other. The plat shows this street to be forty feet wide. The bill averred that the complainant had been in open, adverse possession of said lot 104, including the disputed strip, for a great many years, dating back to a period prior to the Civil War, and the proof showed that to be true. There was a decree in favor of the complainant from which the city prosecuted an appeal, and the court reversed the judgment, holding that the city could not be denied complainant's right to the street by the facts set forth. In 10 R. C. L. 401, section 148, it is stated that: "As a general principle laches is not imputable to the government. This doctrine is one

of public policy and is based on the assumption that the officers of the government may be so busily engaged in the ordinary affairs of state as to neglect a vindication of its interest in the courts. Again, it is said that the government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches could be applied to its transactions. Where, however, the government is suing for the use and benefit of an individual, or for the prosecution of a private and proprietary, instead of a public or governmental right, it is not entitled to the exemption of nullus tempus, and the ordinary rule of laches applies in full force. Nor does a state's right to enforce all obligations, regardless of what period of time may have intervened pass to any of its creditors, but such right is strictly personal to the sovereign.''

In 21 C. J., p. 217, section 216, it is said that: ''While the contrary has been held, yet, by the weight of authority, the defense of laches is not available against the government, state or national, in a suit by it to enforce a public right or to protect a public interest, or, as the rule is sometimes expressed, the laches of its officers or agents will not be imputed to the government. This rule applies, however, only to suits brought by the government in its sovereign capacity to enforce or protect a public or governmental right. If it sues for the use and benefit of an individual, or for the enforcement or the protection of a private and proprietary right rather than a public or governmental right, laches is pleadable against it the same as against an individual. And the privilege of sovereignty in respect of laches is not available to creditors of the government who sue for their own benefit to enforce a claim due it. In some jurisdictions the rule exempting the government from the operation of the doctrine of laches applies in favor of municipal corporations and other governmental agencies

when the right sought to be enforced by them is public or governmental in character, but not otherwise. In other jurisdictions, laches is pleadable against such corporations and agencies the same as against an individual.''

It will be seen from these quotations, and the authorities cited in the notes to sustain them, that there is a distinction in the application of the doctrine of laches and estoppel between suits by a government in its sovereign capacity for the vindication of public rights, and suits by it for the enforcement or vindication of private rights. This distinction must be kept in mind as a key by which the problem is to be determined. In our own state, we have a number of cases which, in my judgment, are directly in point, so far as the principle is concerned, and the doctrine of laches and estoppel is not applied to either the state or municipalities in any case where an officer has acted ultra vires, or without authority of law. In the case before us, the officers were clearly acting without authority of law, ultra vires, and, consequently, no doctrine of laches or estoppel can be applied.

In the case of Edwards Hotel, etc., Co. v. City of Jackson, 96 Miss. 547, 51 So. 802, 803, in the sixth syllabus, it is stated that, ''An ultra vires contract, made with agents of a city, does not operate as an estoppel on the city.''

In the seventh syllabus it is stated that, ''All persons dealing with a city must take note of its charter and the powers of its officers.''

In the fifth syllabus it is stated that a stipulation surrendering the right of the city to pave streets at the cost of abutting owners cannot be enforced because beyond the power of the city authorities.

In the third syllabus it was held that a city could not contract away its charter powers to require the paving of streets and assess a part of the costs on abutting property owners.

On page 575 of 96 Miss. 51 So. 802, 805, the court said in this case that: ''As before stated, the city had no

authority, through its mayor and board of aldermen, under the very terms of the charter, to relieve the street railway company of its duty to do this paving, and any contract looking to this was ultra vires. There seems to be little dissent from the view that an ultra vires contract made with the agents of the city cannot operate as an estoppel on the city. The mayor and board of aldermen are the mere agents of the city, having power to bind the city only within the scope of authority delegated to them. If a city could be estopped on an ultra vires contract by its mere agents, there would be little force in charter restrictions on the power of the agents of the city to bind it, since they could be easily destroyed in this way. All parties dealing with the city must take note of its charter and the power of its officers. It is a matter of law, and the citizens whom they represent cannot be prejudiced by their unauthorized and ultra vires acts. The powers are the city's powers, and not those of the officers who happen to represent the city.''

In the case of Eastman Oil Mills v. State, 130 Miss. 63, 93 So. 484, 487, it was held that state officers cannot grant indulgences authorizing the committal of offenses, and they have no power to authorize the continuance of any business, or act, in violation of law of the state, and that the attempt of the attorney-general to grant permission to a corporation to own and operate a business in violation of a statute did not amount to more than a promise of forbearance on his part, and had no binding force on the state. In the fourth syllabus it is stated that, ''The state cannot be estopped by the unauthorized acts of its officers.'' In that case the attorney-general, having brought suit against the oil mill for violation of anti-trust statutes, agreed with it that during the time the suit was pending the oil mill should continue to operate until the final decision of the case, and the succeeding attorney-general brought suit against the mill for violation of the law during this period of time. There was a period of time of considerable duration in which

the mill had been operating under this agreement. If the doctrine of laches and estoppel could be applied, it should have been applied in that case, for the reason that the constitutionality of the statute was seriously doubted, and the case proceeded through different courts to the United States Supreme Court for final decision upon the constitutional features. Crescent Cotton Oil Co. v. State of Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166.

In Bank of Commerce v. City of Gulfport, 117 Miss. 591, 78 So. 519, it was held that a bank which had been selected as a depository, but had not made bond as required by law, but into which the city had paid its funds as though it were a legal depository, became insolvent or embarrassed. The city sought to recover its funds as trust funds. It was held that the city had the right, and it was not estopped from doing so by its course of business in dealing with the bank as though it were a depository.

In the case of Cleveland State Bank v. Cotton Exchange Bank, 119 Miss. 868, 81 So. 170, the court held that although the county superintendent of education had authority to issue pay certificates to teachers under the law, yet where he did so fraudulently and without having complied with the conditions required by law, that the certificates were void, and the depository which paid them was liable for the funds so paid out. The case was then brought within the doctrine of estoppel, if that could be applied. There the county superintendent had authority to issue the pay certificates and determine the facts which authorized him to do so, but the fact that he did so, and money was paid on said certificates, the bank was liable which paid the money. In the sixth syllabus the rule is announced in the following language: "A county cannot be estopped by the fraudulent acts of the county superintendent of education in issuing school warrants or teachers' pay certificates to parties who had not taught school nor contracted to do so and where there

was no compliance with sections 4560, 4561, 4497 (Hemingway's Code 1917, sections 7376, 7377, 7574)."

In Witherspoon v. City of Meridian, 69 Miss. 288, 13 So. 843, it was held that a city was not estopped by the fact that it had permitted a property owner to build so as to encroach upon the street, and acquiesced in it, or let such condition remain for about sixteen years. There the city had dedicated a street as being a certain width, but with the city's knowledge a property owner had erected a fence so as to include a part of the street under the belief that the fence was on his own land. The doctrine of estoppel was sought to be evoked, but was by the court repudiated. In the fourth syllabus this court said that: "In such case, to bar the municipality on the doctrine of equitable estoppel of its right to remove a fence which encroaches on a street so dedicated, it is not enough to show that the fence was located with the concurrence of the original owner, who had made the dedication, and that the city authorities had delayed for sixteen years to actively assert its claim, during which time they had maintained the street as actually opened, and the abutting owners had improved their lots without knowledge of the city's claim."

In Waterworks Co. v. Meridian, 85 Miss. 515, 37 So. 927, in the fourth syllabus thereto, it was held that: "Where a city had instituted proceedings to cancel a contract with a water company, the former's act in allowing or even in ordering additions and improvements to be made after suit was brought did not estop it from prosecuting the proceedings; but the water company, in making improvements with notice of the pendency of the proceedings acted as a volunteer."

In Woodruff v. Okolona, 57 Miss. 806, it was held that a recital in bonds of city that same are in conformity to the statute is not conclusive in favor of a purchaser for value, but that such purchaser must look to the statute and is chargeable with notice of any want of power to issue the specific bonds. In that case, the board, as in

the case at bar, was acting without authority of law, and although its orders recite regularity of proceeding, yet the purchaser of the bonds was charged with notice of want of power in the board to issue the bonds and was not protected.

In the case of Board of Supervisors of Jefferson County v. Arrighi, 54 Miss. 668, it was held that contracts by county officers in violation of the Act of February 13, 1871 (Acts 1871, p. 101), regulating the manner of making them, are void, and that no subsequent ratification by such officers can make them binding on the county.

See also Hazlehurst v. Mayes, 96 Miss. 656, 51 So. 890; Bay St. Louis v. Bd. Supervisors Hancock County, 80 Miss. 364, 32 So. 54; Powell v. Bd. Supervisors, 107 Miss. 410, 65 So. 499, Ann. Cas. 1916B, 1262.

An interesting case upon the subject, and one which might be relied upon as a complete answer to all that is said in the majority opinion, is the case of State ex rel. Young v. Village of Kent, 96 Minn. 255, 104 N. W. 948, 1 L. R. A. (N. S.) 826, 6 Ann. Cas. 905. In the first syllabus of this case it is said: "When the attorney-general of the state, acting in his official capacity as the chief law officer of the state, exhibits an information in the nature of quo warranto to the district court, and asks that a writ issue, directed to a municipal corporation, requiring it to show cause why its franchise should not be declared null and void, the court has no discretion, but must grant leave to file the information as a matter of course and direct the writ to issue. Upon the return it is the duty of the court to try the issues of law and fact presented thereby, and to determine the same upon the merits according to rules of law applicable thereto."

This case refers to numerous authorities, and elaborately discusses them in a very interesting manner. I will only quote a few passages from it, the opinion being too full to embody in this opinion. At page 260 of 96 Minn., 104 N. W. 948, 950, 6 Ann. Cas. at page 907, it is said:

"The ancient writ thus became obsolete in England, and the proceeding by information in the nature of quo warranto came into use. Informations in the nature of quo warranto were either (1) such as were filed by the Attorney-General ex officio on behalf of the crown, or (2) those exhibited by the Master of the Crown Office on the relation of some private individual. The abuse of the right which the Master of the Crown Office exercised of filing such informations on his own discretion at the instance of private persons who were not named as relators led to the enactment of St. 4 & 5, Wm. & Mary, c. 18, which made it necessary for a person who desired to file such an information to obtain permission to do so from the court and enter into a recognizance for the sum of £20. Rex v. Hertford, Salk, 376. This statute was restrictive in its operation, and the purpose was to restrict the powers of the Master of the Crown Office to vex and oppress the King's subjects. It will be noted that the act in no way restrained or restricted the power of the attorney-general when acting ex officio on behalf of the general public. It related solely to proceedings sought to be instituted by the Master of the Crown Office at the instigation of private individuals. This is also true of the famous St. 9 Anne, c. 20, the substance of which has been embodied in so many American statutes relating to the subject of quo warranto. As we have seen, the former act was restrictive, but the statute of Anne was enacted for 'rendering the proceedings upon writs of mandamus and informations in the nature of quo warranto more speedy and effectual and for the more easy trying and determining the rights of officers in franchises and boroughs.' . . .

"The ancient common-law writ of quo-warranto was a writ of right for the King, and issued as of course at the instance of the attorney-general. 4 Blackstone, p. 309; Abbot of Strata Mercella, 5 Coke, 40; Rex v. Phillips, 4 Burr. 2090; Rex v. Staverton, Yelverton, 190, 1 Bulst. 54; Whelchel v. State, 76 Ga. 644, 647. After the

ancient writ was displaced by the information in the nature of quo warranto, no one, so far as we have been able to discover, ever questioned the right of the attorney-general to appear ex officio as the representative of the Crown, institute the proceedings without leave of court, and have the questions raised determined on their merits according to the laws applicable thereto. Rex v. Phillips, 3 Burr. 1565, per Lord Mansfield. . . .

"Where the common-law procedure prevails either by statutory enactment or adoption by the courts, the authorities in this country uniformly sustain the right of the attorney-general to the writ, when the information is filed by him in his official character as the representative of the state. In the recent case of Meehan v. Bachelder, 73 N. H. 113, 59 A. 620, 6 Ann. Cas. 462, BINGHAM, J., said: 'The attorney-general ex officio has the right to bring an information in the nature of a quo warranto to try the title to a public office, and is not compelled to ask leave of the court.' In Vanatta v. Delaware, etc., R. Co., 38 N. J. Law, 282, Mr. Justice DIXON said: 'When facts exist which, in the opinion of the attorney-general, call for a quo warranto information, he has the right to present it, without leave asked of any one. In that respect he represents the sovereignty, whose attorney he is. Such power existed unquestionably at common law, and neither the statute of 9 Anne nor our own statute in any way abridged it. Before St. 9 Anne quo warranto informations were filed either by the attorney or solicitor-general ex officio, or by an officer of the court under the direction of the court, at the instance of parties concerned. Such officer, in the King's Bench, was the Master of the Crown Office. The statute of 9 Anne merely regulated the practice in some cases of this latter class, requiring the parties concerned to be named as relators and to become responsible for costs, etc. Our statute substitutes the attorney-general for this Master of the Crown Office, and extends the range of the act; but in such case the attorney-general is only nominally a party,

a mere officer of the court, subject to its control. He is not there as attorney-general, exercising in the cause that power which such officer had at common law and which he still wields, when he appears ex officio.' . . .

"In Lamoreaux v. Ellis, 89 Mich. 146, 50 N. W. 812, the court exercised the power to require the attorney-general to set the machinery of the law in motion, and upon a proper and prima-facie showing to file an information in the nature of quo warranto to test the right of an incumbent to the office of sheriff. A similar control over the attorney-general's discretion in permitting such proceeding to be instituted was exercised by the court in State v. Dahl, 69 Minn. 108, 71 N. W. 910. But these cases both arose on the attempt of a private citizen to induce the attorney-general to act. They were instances of the class over which the courts have exercised discretionary control ever since the statute of Anne was enacted. That the Lamoreaux case falls within this class clearly appears from the quotation there made from Vrooman v. Michie, 69 Mich. 42, 36 N. W. 749, where the court said: 'Courts can never act, unless upon some reasonable showing, and, as it is contrary to public policy to allow persons to be needlessly annoyed by vexatious claims, the statute which has long existed in England, while it allows the public representative, who is the attorney-general or some other high official, to proceed ex officio, does not, as construed, permit a relator to proceed without exacting a very precise and positive showing.' State v. McLean County, 11 N. D. 356, 92 N. W. 385, also grew out of a contest between the attorney-general and a private relator. State v. Des Moines, 96 Iowa, 521, 65 N. W. 818, 31 L. R. A. 186, 59 Am. St. Rep. 381, was brought upon the relation of an individual. People v. Sutter St. R. Co., 117 Cal. 604, 49 P. 736, arose upon an information filed by the attorney-general upon the relation of a private person, and it was held that the attorney-general could not thereafter himself dismiss the proceedings without an order of court."

In the case State of Minnesota ex rel. Phobstfield v. Sharp et al., 27 Minn. 38, 6 N. W. 408, in the first syllabus, it is announced: "A proceeding by information, in the nature of quo warranto, under section 1, chapter 63, is not the action provided for in chapter 79, Gen. St. 1878. In the absence of legislation, or any controlling consideration to the contrary, such proceeding is governed as respects procedure, by common-law rules. The onus probandi is therefore upon the respondent. It is for the attorney-general to determine whether the public good requires him to institute and conduct such proceeding. If he deems it best to proceed, notwithstanding any conduct of the relator, at whose instance he moves, it would be a very extraordinary case (if any) in which his determination would be overruled."

In this opinion, after stating the statutory provisions, the court further said: "At the start it is objected by the respondents that the relator, Probstfield, has actively acquiesced in the exercise of the franchise spoken of, and the respondents' assumption of title to the offices in question, and in their discharge of the alleged powers and duties of the same, and that he is, therefore, estopped to institute or conduct this proceeding. The answer to this is that it is the attorney-general who has instituted and who is conducting the proceeding, as the law officer of the state—the representative, not of the relator, but of the government. It is for him to determine whether the public good requires him to proceed in the matter. If he deems it best to proceed, notwithstanding any conduct of the party at whose instance he moves, if there is any case in which his determination would be overruled, it must certainly be a very extraordinary one, and not such a case as this."

In High's Extraordinary Legal Remedies (2 Ed.), p. 499, after discussing various questions as to quo warranto, it is stated: "But while the courts are disposed to overlook trifling irregularities in the election of officers who have held long and undisturbed possession of

their franchise, length of time will not prevail as against the sovereign, where the irregularities in the election go to the very question of right, and in such cases, the maxim nullum tempus occurrit regi applies with especial force. So when the proceeding is instituted by the attorney-general in behalf of the state, the fact that the relator has acquiesced in the exercise by respondents of the franchise in question will not operate as an estoppel."

See also State v. Turnpike Co., 8 R. I. 521, 94 Am. Dec. 123.

Under our statute the quo warranto referred to in the majority opinion does not require the attorney-general to procure leave of the court in order to file suit. The court has nothing to do with his discretion as to whether he shall file suit, or whether a writ should issue. He exercises the discretion conferred upon him as the representative of the state, and the court has no right or power to refuse to hear a suit brought by him. His discretion is now reviewable by the court under the statutes of this state.

In Woodberry v. McClurg, 78 Miss. 831, 29 So. 514, it was undertaken to compel the attorney-general to approve a charter which he had declined to approve for the reason that, in his opinion, it was in violation of law. In the third syllabus of this case it is announced: "The courts will not undertake to control the attorney-general in the matter of his official opinions." In other words, the court refused to exercise any control over the discretion granted to the attorney-general. The Constitution does not confer upon courts any express power to control the bringing of suits by the state or any of its subdivisions. The statutes have not conferred upon the courts any such power, but have conferred upon the attorney-general the power to bring suits on behalf of the public in all cases affecting the public right, and upon district attorneys to also bring certain suits. A district attorney is a representative of the state, and decides for the state whether certain suits shall be brought or not.

We are not at liberty to overrule his judgment upon the question as to the propriety of bringing suits, nor have we any discretion to withhold a judgment at law because of any real or fancied neglect on the part of the district attorney to act.

However, if we had such power, this case is not one where it should be exercised. The present suit was not brought until slightly more than six years, but that is not an unreasonable period of time.

There are other cases in which we have been called upon to decide this question, being suits brought by private persons in which it was sought to test this question, but which we found unnecessary to do to dispose of them in private litigation. One of these was Greenwood v. Provine, 143 Miss. 42, 108 So. 284, 45 A. L. R. 824, filed October 10, 1925, and, subsequently, another suit, Gwin v. Greenwood, 150 Miss. 656, 115 So. 890, 58 A. L. R. 849, was filed, which, as did the first, sought to have the questions here presented adjudicated; but these suits failed to get the judgment of the court upon the questions here presented.

The majority opinion cites the case of City of Jackson v. Merchants' Bank & Trust Co., 112 Miss. 537, 73 So. 573, as supporting the rule announced. That case is distinguishable, because there the city had the right and power, and owed a duty to the people, to establish its street lines, and it had, in fact, had its surveyor to locate the line for the property owner when the building was erected, and the property owner, relying upon the correctness of the surveyor's lines, erected his building so as to extend into a street according to the true survey. The court refused to compel the property owner to remove his building because of the great injustice and expense. There the officer was acting within the scope of his duty in acting for the city, and it was not a case of an ultra vires action. Therefore that case has no force as authority here. There is also a difference between the application of laches and estoppel to a municipality

and to a sovereign state. Municipalities are sometimes estopped when a state would not be under the same circumstances.

The majority opinion also cites the case of Ætna Ins. Co. v. Robertson, 131 Miss. 343, 94 So. 7, 95 So. 137. I am utterly unable to see how this decision can be construed as applying the doctrine of laches and estoppel. In the first syllabus of the opinion it is expressly held that: "Laches cannot be imputed to the state and invoked as a defense in a suit brought by the State Revenue Agent to collect penalties that have been incurred because of a violation of the state's anti-trust laws."

If there was any case where the doctrine of laches should have been applied, it was in a case such as there decided, where suits were brought for penalties accruing daily in large amounts, and running through a long period of years, and which, if enforced, meant, practically, confiscation of the capital involved, and also where such a peculiar situation existed—the withdrawal from the state by many insurance companies, large business built up and made profitable by the business sagacity of the owner of the business being thus destroyed, and the general public being greatly restricted in, and sometimes entirely prevented from, obtaining insurance upon property.

I cannot yield my consent to attaching to property rights an importance superior to governmental rights, and especially as applied to penal statutes. That was a case in the chancery court which proceeds according to equitable rules and principles, and laches is a doctrine of a court of equity, and has no application to a court of law. It is true that in some states it has been held that courts of law would apply the doctrine of laches, but in others only the chancery, while in other states the decisions are due to peculiar statutes—statutes difficult of being understood by judges and lawyers of other jurisdictions who are not entirely familiar with the statutory system of the state. Originally, equity had jurisdiction of

the power to award relief upon conscientious considerations, and laches grew out of conscientious considerations by which equity courts determined the remedy where there had been laches, although courts of law would award remedies in any case.

The case before us is in a court of law as distinguished from equity, and the rule, for that reason, should not be applied.

The majority opinion relies principally upon the case of State v. Des Moines, 96 Iowa 521, 65 N. W. 818, 819, 31 L. R. A. 186, 59 Am. St. Rep. 381. This is a case not brought by the sovereign to vindicate a public right, but it was brought by a private person, and the rule, as above stated, distinguishes it from this case. In other words, it is no authority. Where a state is bringing a suit to vindicate a private right, it is as though a private person were suing in his own name. Many of the cases cited in the majority opinion are similar, that is, they are cases dealing with suits brought by private persons to vindicate private rights. There are some cases which sustain the majority opinion, but their reasoning is not satisfactory, and the basis of the decisions is not always clear. An analysis of them will, in my opinion, prove unsatisfactory to a lawyer who takes the whole line of cases and tries to deduce the true rule.

I always feel safe when I am in harmony with the decisions of the supreme court of the United States. That court has held, in many cases, with the views expressed in this opinion. In U. S. v. N. C. & St. L. R. R. Co., 118 U. S. 120, 6 S. Ct. 1006, 1008, 30 L. Ed. 81, the decision states as follows: "It is settled beyond doubt or controversy, upon the foundation of the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided, that the United States, asserting rights vested in them as a sovereign government, are not bound by any statute of limitations unless congress has clearly

manifested its intention that they should be so bound. Lindsey v. Miller, 6 Pet. 666 (31 U. S.) 8 L. Ed. 538; United States v. Knight, 14 Pet. 301, 315 (39 U. S.) 10 L. Ed. 465; Gibson v. Chouteau, 13 Wall. 92 (80 U. S.) 20 L. Ed. 534; United States v. Thompson, 98 U. S. 586, 25 L. Ed. 194; Fink v. O'Neil, 106 U. S. 272, 281, 1 S. Ct. 325, 27 L. Ed. 196.''

I therefore think the case at bar should be reversed and judgment of the court rendered for the state. But it requires a majority of the judges to reverse a case, and, as the court is equally divided, we all recognize the rule that the judgment must be affirmed where there is an equally divided court.

SMITH, C. J., and McGOWEN, J., concur in this opinion.

## ON SUGGESTION OF ERROR.

**Griffith, J.**, delivered the opinion on suggestion of error.

Although the opinion heretofore delivered in this case did not in express words so say, it carries the implication, as fully as if said, that we intended to hold and did hold that we would exercise the discretion to consider all the circumstances of a case, in quo warranto, and if on a full view of these circumstances it appeared clear that the public welfare not only would not be promoted, but the reverse would be the result, and that by reason of the lapse of time harm rather than good would result to the public interest, we would decline to interfere in a proceeding in quo warranto designed to "disturb the peace and quiet" of any public or quasi-public corporation, and that the doctrine of laches would be applied in such cases, although not ordinarily applicable in proceedings by the state. In other words, in such a proceeding we would not consent that the principle that no lapse of time runs against the state, a doctrine established to promote the interests of the state and to save it from harm, shall be reversed in its purpose and be so used as to harm the state and the general welfare. The lan-

guage has often been used in this court that that which is designed as a shield shall not be permitted to be turned into a sword.

It is now earnestly insisted, however, on the suggestion of error that the discretion in this respect is vested by the statute exclusively in the attorney-general or in the district attorney, because under the statute no leave of court is required, as was the case under the ancient practice. There is authority for the view thus urged, but we are of opinion that the better rule is that laid down by the authorities which hold to the contrary and to the effect that "at the hearing or in applying a remedy in quo warranto, the court is possessed of a degree of discretionary power which enables it to take cognizance of laches or delay in instituting proceedings, of the same character as it exercises in granting or refusing the right to file an information. This discretion is employed particularly in cases wherein the information is filed without leave of the court. . . . It has sometimes been said that the courts of this country have come to exercise in the final disposition of quo warranto cases that discretion which was originally only exercised in allowing the information to be filed; and they have come to exercise some discretion where the proceeding is instituted by the state on the information of a state officer." 22 R. C. L. 704, and authorities cited in the notes, and see the notes pages 488-491 in Ann. Cas. 1914C. As said in State v. Mansfield, 99 Mo. App. 146, 72 S. W. 471, 473: "These quo warranto proceedings are now commonly instituted of course, and without leave; and, if there is to be any discretion used about the relief at all, it must be used in delivering judgment. So, too, as the proceeding may be instituted at the relation of any prosecuting attorney, the sanctity which originally attached to it when the information was exhibited by a great officer like the attorney-general of England, or the attorney-general of the United States or of a state, who is supposed to represent in a peculiar degree the prerogative and sover-

eignty of the state, no longer exists; . . . and at no stage, considering its present characteristics, and the modern practice tolerating the filing of informations as a matter of course, can the discretion be so wisely or justly exercised as after the cause has been heard, and the court is fully advised as to the facts.''

Suggestion of error overruled.

**Ethridge, J.**, delivered the dissenting opinion.

The judges who dissented from the original opinion herein could well stand upon the views and authorities cited in the dissenting opinion; but, since the opinion on the suggestion of error therein, the affirming judges have squarely placed their opinion upon the proposition that the court has a discretion in quo warranto, which it may exercise in refusing aid to the state, where, in the opinion of the court, a suit would injure rather than help the general welfare.

I think this is a very dangerous power for the court to assume, and one that has not been conferred upon it by law.

The state, in partiting the powers of government, has designated to particular officers certain powers, and in such case the officer to whom the power is designated represents the state, and is responsible for the exercise of his discretion and judgment. By section 3217, Hemingway's 1927 Code, section 4018, Code of 1906, power to institute proceedings in quo warranto is conferred upon the attorney-general or district attorney. This section is a specific designation as to who shall institute such proceedings. It provides as follows:

''The proceedings in such cases shall be by information, in the name of the state, by the attorney-general or a district attorney, on his own motion or on relation of another,'' etc.

The attorney-general and district attorney are given the power, by the legislature, to institute this proceeding,

upon their own motions, and they are not required to obtain leave of the court, or leave of any other person. Such attorney-general, or district attorney, is the officer to whom the state has confided the power and discretion with reference to whether a suit shall be brought. The court is nowhere given this power, and did not have it at common law. The court's power is derived from the Constitution, statutes, and common law, and it has no other powers than those conferred.

In my opinion, it is peculiarly appropriate that this discretion is conferred in this manner. The expediency and wisdom of bringing a suit, or refraining from so doing, is hedged about and commingled with economic and political considerations. The court should confine its activities to decisions upon the merits of suits when they have been brought, and to administering justice according to law, entirely separate from the expediency or righteousness of the litigation. At the common law, the attorney-general brought quo warranto proceedings upon his own motion and of right. He was supposed to represent the King in so doing, and not the judicial or legislative branches of the government. In addition to the authorities heretofore cited upon this proposition, see 17 Encyc. Pl. and Pr., p. 444, where it is said: "At common law the attorney-general had the right ex officio to sue out a writ of quo warranto or to bring an information in the nature of a quo warranto on behalf of the sovereign without leave of court, it being a writ of right for the sovereign"—citing Attorney-General v. Sullivan, 163 Mass. 446, 40 N. E. 483, 28 L. R. A. 455; Rex v. Trelawney, 3 Burr. 1616. Subsequently, Parliament passed acts requiring leave of the court to be obtained by one seeking a writ of quo warranto, but these English statutes were never adopted in Mississippi as a part of the common law. This accounts for the difference in the decisions of courts. In most of the states, they have adopted the English statutes passed prior to the Revolution, as a part of the common law. At page 488, 17 Encyc.

Pl. and Pr. it is said: "(a) But the attorney-general, in the exercise of his common-law and inherent powers to file ex officio informations, still has the right to act in such proceedings upon his own motion and without leave of court, either in filing an information or in suing out the writ where the latter is the proper remedy. (b) The attorney-general or other representative of the people is the officer in whom is vested the discretion to institute quo warranto proceedings on behalf of the people, unless otherwise provided by statute, and with this discretion courts will not interfere, unless, as is held in some cases, there is a clear abuse of discretion."

The "some cases" referred to are cases where, under the peculiar jurisprudence and common law of the state, the English statutes existing prior to the Revolution were adopted. As above stated, these statutes have never been adopted in Mississippi. The discretion has been confided to the attorney-general or the district attorney in this state, and I am satisfied that these officers are safe repositories of that power, and that we are not called upon to supervise them in the exercise of their discretion. I think it would result injuriously to the public interest to do so. I know of no greater danger to the court than to assume powers not conferred upon it by law. It is the one branch of the government whose decisions upon constitutional questions and legal constructions are not subject to review by any other department. Its decisions can only be corrected by statute or constitutional enactment.

SMITH, C. J., and McGOWEN, J., concur.